BOARD OF TRUSTEES OF BASTROP
INDEPENDENT SCHOOL
DISTRICT, Petitioner,

v.

September M. TOUNGATE, a/n/f
of Zachariah Toungate, a
Minor, Respondent.

No. 96–0690.

Supreme Court of Texas.

Argued April 24, 1997.

Decided Oct. 23, 1997.

Rehearing Overruled Feb. 13, 1998.

Eric W. Schulze, Paul W. Hunn, Austin, for Petitioner.

Charles Beall, Paul E. Knisely, Austin, for Respondent.

OWEN, Justice, delivered the opinion of the Court in which PHILLIPS, Chief Justice, GONZALEZ, HECHT and ABBOTT, Justices join.

The issue in this case is whether a hair-length regulation that applies to male students at a public elementary school but not to female students violates TEX. CIV. PRAC. & REM.CODE § 106.001(a). We conclude that it does not and accordingly reverse the judgment of the court of appeals and render judgment for Bastrop Independent School District.

I

Eight year old Zachariah Toungate was a third grade student at Mina Elementary in the Bastrop Independent School District. At the beginning of the school year, school officials observed that Zachariah had a ponytail, popularly known as a rat tail, that extended five inches below the bottom of his collar in violation of a provision of the grooming code that applied to all male students but not to females. The principal of the school advised September Toungate, Zachariah's mother, that her son's hair must be cut. She responded that she would not "force" Zachari-ah to cut his hair but requested that he be permitted to pin the ponytail up or to tuck it inside his shirt. The school refused to accept either of those alternatives and suspended Zachariah for three days. The Toungates remained steadfast in their refusal to comply with the hair-length provisions of the dress code.

At the end of the three-day suspension, Zachariah was allowed to return to school but was subjected to "in-school suspension," which meant that he was essentially isolated from his classmates. His former teacher prepared his lesson plans, but he was taught by substitute teachers. Except for a few days when other students were also subject to in-school suspension, Zachariah was the sole pupil. His classroom was relatively small, 12 feet by 15 feet, and its windows were covered with heavy paper. Zachariah was not permitted to have lunch with the other children, he took recess alone, and he was not allowed to participate in choral activities or the Christmas program, although he was permitted to attend and observe the latter event. During the in-school suspension, Zachariah's academic performance improved, but after four months of segregation from his classmates, September Toungate withdrew her son from Mina Elementary on the advice of a psychologist and pursued home schooling.

These events prompted September Toungate to file suit against BISD as next friend of Zachariah. The trial court granted summary judgment in favor of BISD. That judgment was reversed in part on appeal, *Toungate v. Bastrop Independent School District,* 842 S.W.2d 823 (Tex.App.—Austin 1992, no writ), and neither party sought review in this Court. On remand, a jury trial ensued, special issues were submitted, and the jury answered all issues favorably to BISD. The trial court at first rendered a take-nothing judgment against Toungate, but later modified that judgment to instead grant relief to Toungate. In the modified judgment, the trial court held that BISD had violated the Texas Equal Rights Amendment, TEX. CONST. art. I, § 3a, and had violated TEX. CIV. PRAC. & REM.CODE § 106.001(a)(4)-(6). BISD was permanently enjoined from enforcing the

hairlength regulation, and Toungate was awarded attorney's fees.

BISD appealed. The court of appeals affirmed the judgment on the basis of the statutory claim but held that the constitutional claim was foreclosed by this Court's decision in *Barber v. Colorado Independent School District*, 901 S.W.2d 447 (Tex.1995). We granted BISD's application for writ of error.

## II

Before we proceed to the more substantive issues in this case, we briefly address the contention of BISD that the take-nothing judgment that was at first rendered by the trial court is the only valid judgment. BISD argues that the trial court did not timely render the subsequent modified judgment and therefore that it is a nullity. The question arises because the trial court signed the modified judgment when it had plenary power to do so but then waited 31 days to notify the parties, and the modified judgment was not filed until 38 days after it had been signed. BISD asserts that once the trial court *signed* the modified judgment, it had only 30 days in which to accomplish *rendition* of that judgment which, it argues, included notification of the parties and filing.

■ The initial judgment, which was the take-nothing judgment against Toungate, was rendered on November 29, 1994. Toungate filed a timely motion to modify or reform the judgment, and the trial court signed the modified judgment in favor of Toungate on January 10, 1995, well within its plenary power. *See* TEX.R. CIV. P. 329b. Upon signing the modified judgment, the trial court then had plenary power to set aside or to further modify or reform that judgment within 30 days, absent another motion extending the time periods. *See* TEX.R. CIV. P. 329b(h), 329b(d). BISD cites TEX.R. CIV. P. 300 and argues that rendition did not occur within the 30–day plenary period after the modified judgment was signed.

■ Rule 300 does not bear on the controversy at hand. It provides only that judgment shall be rendered on a special verdict or findings of fact by the trial court unless that verdict or the findings are set aside or a new trial is granted. TEX.R. CIV. P. 300. The governing rule is TEX.R. CIV. P. 306a(1):

> The date of [sic] judgment or order is signed as shown of record shall determine the beginning of the periods prescribed by these rules for the court's plenary power to grant a new trial or to vacate, modify, correct or reform a judgment or order and for filing in the trial court the various documents that these rules authorize a party to file within such periods including, but not limited to, motions for new trial, motions to modify judgment, motions to reinstate a case dismissed for want of prosecution, motions to vacate judgment and requests for findings of fact and conclusions of law; but this rule shall not determine what constitutes rendition of a judgment or order for any other purpose.

TEX.R. CIV. P. 306a(1).

■ Accordingly, it is the signing of the modified judgment that determines whether the trial court acted within its plenary power. The modified judgment in this case was rendered when signed on January 10, 1995. Under TEX.R. CIV. P. 306a(4), BISD's right to appeal was still protected even though the parties did not receive timely notice of the judgment. The appellate timetable did not start to run until BISD was notified of the judgment on February 10. We note that the trial court should have submitted the modified judgment to the clerk immediately upon signing it to avoid the burden of a notification hearing. *See* TEX.R. CIV. P. 306a(3),(4).

We turn now to the merits of this hairlength dispute, which has led to extended proceedings in the trial court and two appeals.

## III

The grooming code provision that gave rise to this controversy provided:

> Boys' hair must meet the following guidelines: The rear length must be no longer than to the bottom of a regular shirt collar. On the sides, the ear lobe must be visible. In the front, the length cannot be longer than the top of the eyebrows.

We articulated the proposition in *Barber* that constitutional challenges to hair-length policies adopted by elementary and secondary schools "do not manifest such an affront to [a student's] constitutional rights as to merit our intervention." 901 S.W.2d at 450. We essentially deemed constitutional challenges to hair-length regulations to be non-justiciable and abstained from injecting this and other courts into the fray, although we strongly hinted that there was no violation of constitutional rights. *Id.*

■ We are now faced with construing a statute that relates to, but stands independent of, the Equal Rights Amendment to the Texas Constitution, TEX. CONST. art. I, § 3a. Our decision in *Barber* does not resolve the question of statutory construction. The statute is distinct from the ERA and must be applied accordingly, unless it runs afoul of the Constitutions of the United States or of this State. There is no claim in this case that section 106.001, as opposed to the school's grooming code, violates any provision of our state or federal constitutions, and accordingly, the statute should be given full effect. However, it is abundantly clear in examining the history of TEX. CIV. PRAC. & REM.CODE § 106.001, and the wealth of decisions from other jurisdictions construing similar enactments, that this statute was never intended to prohibit the adoption and enforcement of grooming standards by schools.

A

The statute on which Toungate relies provides in pertinent part:

**§ 106.001. Prohibited Acts**

(a) An officer or employee of the state or of a political subdivision of the state who is acting or purporting to act in an official capacity may not, because of a person's race, religion, color, sex, or national origin:

\* \* \*

(4) refuse to permit the person to participate in a program owned, operated, or managed by or on behalf of the state or a political subdivision of the state;

(5) refuse to grant a benefit to the person;

(6) impose an unreasonable burden on the person.

TEX. CIV. PRAC. & REM.CODE § 106.001.

The original version of section 106.001 was enacted in 1967 as TEX.REV.CIV. STAT. art. 6252–16(1)(a) and did not include gender among the prohibited bases of discrimination. *See* Act of April 18, 1967, 60th Leg., R.S., ch. 72, § 1, 1967 Tex. Gen. Laws 138. The word "sex" was added to "race, religion, color, or national origin" in 1971 during the same session in which the Texas Legislature voted to place the Equal Rights Amendment on the ballot of the next election. Thus, article 6252–16 would have been effective even if the ERA had not passed, and it read as follows after its amendment in 1971:

Section 1. (a) No officer or employee of the state or of a political subdivision of the state, when acting or purporting to act in his official capacity, may:

(1) refuse to employ a person because of the person's race, religion, color, sex, or national origin;

(2) discharge a person from employment because of the person's race, religion, color, sex, or national origin;

(3) refuse to issue a license, permit, or certificate to a person because of the person's race, religion, color, sex, or national origin;

(4) revoke or suspend the license, permit or certificate of a person because of the person's race, religion, color, sex, or national origin;

(5) refuse to permit a person to use facilities open to the public and owned, operated, or managed by or on behalf of the state or a political subdivision of the state, because of the person's race, religion, color, sex, or national origin;

(6) refuse to permit a person to participate in a program owned, operated, or managed by or on behalf of the state or a political subdivision of the state, because of the person's race, religion, color, sex, or national origin;

(7) refuse to grant a benefit to, or impose an unreasonable burden upon, a person because of the person's race, religion, color, sex, or national origin;

(8) refuse to let a bid to a person because of the person's race, religion, color, sex, or national origin.

Act of June 15, 1971, 62nd Leg., R.S., ch. 989, § 1, 1971 Tex. Gen. Laws 2994, 2995.

The foregoing statute, which was the predecessor of TEX. CIV. PRAC. & REM.CODE § 106.001, was amended again in 1983, and those amendments give significant insight into the meaning of the phrase "because of ... sex." The 1983 amendments reveal that a part of what is now the Human Rights Act, TEX. LAB.CODE §§ 21.001–.306, which was enacted in the wake of Title VII, 42 U.S.C. §§ 2000e to 2000e–17, was taken directly from former article 6252–16, including the words "because of ... sex." Human Rights Act, 68th Leg., R.S., ch. 7, §§ 5.01(1)-(2), 10.02, 1983 Tex. Gen. Laws 37, 45, 56 (formerly TEX.REV.CIV. STAT. art. 5221k, §§ 1.01–10.01, 10.04–10.05). Subsections 1(a) and (b) of article 6252–16, quoted above, regarding hiring and firing "because of ... sex" or other factors, were moved into the Human Rights Act, and the remaining subsections were renumbered. *Id.* At the time of this legislation, there were numerous state and federal decisions, dating back more than a decade, that had construed the phrase "because of sex" in statutes virtually identical to the Texas Human Rights Act. With few exceptions, those decisions had held that "because of sex" does not prohibit the imposition of grooming or dress codes that differentiate between males and females. *See infra* Part III.C. The Legislature undoubtedly was aware of this precedent when it amended former article 6252–16 and enacted what is now TEX. LAB.CODE § 21.051.

If the Legislature had intended "because of sex" to encompass grooming or dress regulations, it would have said so in light of the overwhelming weight of authority to the contrary. It did not. The 1983 version of the Human Rights Act provided that the phrase " 'because of sex' ... includes but is not limited to discrimination because of or on the basis of pregnancy, childbirth, or related medical conditions." Human Rights Act, 68th Leg., 1st C.S., ch. 7, § 1.04(c), 1983 Tex. Gen. Laws 37, 38. That definition was essentially unchanged when the Act was recodified in the Texas Labor Code. *See* TEX. LAB.CODE § 21.106. There was and is no mention of grooming or dress codes.

Thus TEX. CIV. PRAC. & REM.CODE § 106.001 and TEX. LAB.CODE § 21.051 have a common origin. Both statutes contain virtually the same phrase: "because of a person's race, religion, color, sex, or national origin." TEX. CIV. PRAC. & REM.CODE § 106.001(a); TEX. LAB.CODE § 21.051. While there are differences between 106.001 and 21.051 (both apply to state employees and political subdivisions of the state, while 21.051 also applies to many private employers), there has never been any indication from the Legislature that "because of ... sex" means one thing in TEX. CIV. PRAC. & REM.CODE § 106.001 and something else in its sibling TEX. LAB.CODE § 21.051. It would be an unreasonable construction of section 106.001 to conclude that "because of sex" prohibits dress codes that recognize a difference between the sexes in light of the history of these statutes.

B

Another factor to consider in construing the statute is that there are criminal penalties for knowing violations of section 106.001. TEX. CIV. PRAC. & REM.CODE § 106.003. Offenders may be punished by a fine of not more than $1,000, confinement in jail for not more than one year, or both. *Id.* It is difficult to believe that in 1971, when the Legislature first included "sex" in the predecessor of section 106.001, it intended to subject administrators of schools all across Texas to criminal penalties for enforcing hair-length restrictions for male students that differed from those applicable to female students. If that is what the Legislature intended, then it also intended criminal penalties to be imposed on school administrators who enforce dress codes that prohibit males from wearing dresses or skirts. If hair-length regulations are discrimination "because of sex," then certainly the prohibition of males wearing dresses is "because of sex." As the District of Columbia Circuit said in discussing the analogy of hair-length rules to requirements that men not wear dresses and that men and women use separate toilet facilities, "[a]dmittedly these are extreme examples, but they

are important here because they are logically indistinguishable from hair-length regulations." *Dodge v. Giant Food, Inc.*, 488 F.2d 1333, 1336 (D.C.Cir.1973) (holding that hair-length restrictions applicable to males but not to females did not discriminate within the meaning of Title VII, 42 U.S.C. § 2000e–2).

The fact that criminal penalties are associated with violations of section 106.001 weighs heavily against construing it to prohibit school officials from enforcing dress codes. There is no indication that the Legislature was of the view that "because of sex" extended that far. As already discussed, there is an almost irrefutable indication to the contrary. *See also Duke v. University of Tex.*, 663 F.2d 522, 526 (5th Cir.1981) (construing former article 6252–16 and holding that penal provisions of the statute reinforced the conclusion that the charges of discrimination at issue were not prohibited by the statute).

### C

The considerable weight of authority in federal and state courts holds that grooming and dress codes do not violate statutes similar to TEX. LAB.CODE § 21.051. The rationale of those decisions is persuasive.

Title VII of the Civil Rights Act of 1964, as amended, prohibits certain types of discrimination "because of such individual's … sex." 42 U.S.C. § 2000e–2(a). The language of TEX. LAB.CODE § 21.051 regarding discrimination based on sex is almost identical to this federal statute.[1] Of the seven circuit courts that have considered whether an employer's regulation of the hair length of males violates Title VII, all have held that it does not. *See Tavora v. New York Mercantile Exch.*, 101 F.3d 907 (2d Cir.1996); *Barker v. Taft Broad. Co.*, 549 F.2d 400 (6th Cir.1977); *Earwood v. Continental Southeastern Lines, Inc.*, 539 F.2d 1349 (4th Cir.1976); *Longo v.*

*Carlisle DeCoppet & Co.*, 537 F.2d 685 (2d Cir.1976); *Knott v. Missouri Pac. R.R.*, 527 F.2d 1249 (8th Cir.1975); *Willingham v. Macon Tel. Publ'g Co.*, 507 F.2d 1084 (5th Cir. 1975); *Baker v. California Land Title Co.*, 507 F.2d 895 (9th Cir.1974); *Dodge v. Giant Food, Inc.*, 488 F.2d 1333 (D.C.Cir.1973); *Fagan v. National Cash Register Co.*, 481 F.2d 1115 (D.C.Cir.1973); *Ferrell v. Dallas Indep. Sch. Dist.*, 392 F.2d 697 (5th Cir.1968). Similarly, a requirement that men wear ties was upheld in the face of a charge of sex discrimination under Title VII. *See Fountain v. Safeway Stores, Inc.*, 555 F.2d 753 (9th Cir.1977).

Most of the foregoing decisions recognize that the purpose of Title VII was to guarantee equal job opportunities for males and females and that there was no indication in the Civil Rights Act or its legislative history that discrimination "because of sex" included hair worn in contravention of an employer's good grooming regulations. *See, e.g., Willingham*, 507 F.2d at 1091; *Fagan*, 481 F.2d at 1125. Courts have also concluded that

> hair length regulations "are classifications by sex … which do not represent any attempt by the employer to prevent the employment of a particular sex, and which do not pose distinct employment disadvantages for one sex. Neither sex is elevated by these regulations to an appreciably higher occupational level than the other."

*Willingham*, 507 F.2d at 1091–92 (quoting *Dodge*, 488 F.2d at 1337).

The purposes and objectives of TEX. CIV. PRAC. & REM.CODE § 106.001 are similar to those of Title VII. They are to prohibit the imposition of distinct disadvantages on one sex and to prohibit other discriminatory practices that affect the access of one sex to state benefits, amenities, or opportunities enjoyed by the other sex. Hair-length regula-

---

1. The pertinent portions of Title VII provide:
   **(a) Employer practices**
   It shall be an unlawful employment practice for an employer—
   (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex …; or

(2) to limit, segregate, or classify his employees … in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's … sex.

42 U.S.C. § 2000e–2(a).

tions in schools are not of this nature. Grooming requirements do not elevate the status of one sex over another or deny educational opportunity "because of sex" any more than an employer's imposition of grooming requirements would foreclose opportunities "because of sex."

In this regard, there is a similarity between the employer/employee relationship and the relationship between school administrators and students. School administrators stand in loco parentis and are expected to exert some control over the children that they are hopefully preparing to send into the workplace. There is a valid distinction, which we drew in *Barber,* between state regulation of adults and state regulation of elementary and secondary school children. 901 S.W.2d at 450–51. For example, it may well be that an attempt by the State of Texas to impose grooming and dress code requirements on the general populace would be unconstitutional as a violation of a liberty interest. *Cf. Earwood,* 539 F.2d at 1351 (stating that the right to wear long hair is clearly protected against government interference but that as against an employer, even a government employer, a grooming regulation will be sustained unless it is so arbitrary that it is a deprivation of a person's liberty interest).

Those who have argued that hair-length regulations violate Title VII or similar state statutes have often cited *Phillips v. Martin Marietta Corp.,* 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1970). *See, e.g., Earwood,* 539 F.2d at 1351; *Fagan,* 481 F.2d at 1120; *see also Knott,* 527 F.2d at 1250–51. *Phillips* held that Title VII prohibited a hiring policy that excluded from consideration women with pre-school age children but did not exclude similarly situated men. Some of the circuit courts that have addressed the issue of hair-length regulation have distinguished the decision in *Phillips* on the basis that Title VII was intended to remove barriers that had operated in the past to favor an identifiable group (males) over another (females). *See, e.g., Fagan,* 481 F.2d at 1119–20.

The reasoning in these decisions is equally applicable to the regulation of hair length in schools. The requirement that males wear their hair no longer than a certain length may be out of step with the social norms of the moment, but it does not deprive male students of an equal opportunity to receive an education or to participate in school functions. Nor does regulation of males' hair length elevate females above males any more than a requirement that females wear their skirts no shorter than a specified length elevates males above females. Hair-length restrictions for male students impose no barriers that operate to favor one sex over the other.

■ This is not to say that dress codes can never be discriminatory "because of sex." The Seventh Circuit correctly held that an employer had crossed the line when it required women to wear uniforms but not men working in the same types of positions. *Carroll v. Talman Fed. Sav. & Loan Ass'n,* 604 F.2d 1028 (7th Cir.1979). That court distinguished the facts before it from decisions addressing the length of men's hair or the requirement that men wear ties. *Id.* at 1032 (citing *Fagan,* 481 F.2d at 1115, and *Fountain,* 555 F.2d at 756). The *Carroll* court accurately perceived that when some employees are uniformed and others are not, "there is a natural tendency to assume that the uniformed women have a lesser professional status than their male colleagues attired in normal business attire." *Id.* at 1033. The court observed that regulation of personal appearance is not necessarily in violation of Title VII even though different standards are prescribed for men and women. The uniforms at issue in *Carroll* discriminated on the basis of sex because two sets of employees performing the same functions were subjected to two entirely separate dress codes—one including a variety of normal business attire and the other requiring a clearly identifiable uniform. *Id.* at 1032.

The rationale of *Carroll* illuminates the difference between discrimination "because of sex" and grooming or dress requirements that differentiate among men and women. It was the obvious stigma associated with a uniform, not the dress code per se, that was discriminatory "because of sex" in *Carroll.* Again, this reasoning applies with equal force to grooming and dress codes in our schools.

Many states have enacted statutes similar to TEX. LAB.CODE § 21.051 and TEX. CIV. PRAC. & REM.CODE § 106.001. Most of the state courts that have construed such statutes have held that regulation of hair length or other grooming or dress requirements is not discrimination because of sex. *See, e.g., Pik–Kwik Stores, Inc. v. Commission on Human Rights & Opportunities,* 170 Conn. 327, 365 A.2d 1210 (1976) (private employer's hair-length regulations not discriminatory under statute); *Indiana Civil Rights Comm'n v. Sutherland Lumber,* 182 Ind.App. 133, 394 N.E.2d 949 (1979) (private employer's facial hair regulation is not sex discrimination under the Indiana Civil Rights Law); *Bedker v. Domino's Pizza, Inc.,* 195 Mich. App. 725, 491 N.W.2d 275 (1992) (private employer's hair-length regulations did not violate Michigan's Civil Rights Act); *Planchet v. New Hampshire Hosp.,* 115 N.H. 361, 341 A.2d 267 (1975) (private employer's dismissal of security guard for refusing to cut hair did not violate state statute); *Page Airways of Albany, Inc. v. New York State Div. of Human Rights,* 50 A.D.2d 83, 376 N.Y.S.2d 32 (1975) (private employer's hair-length regulation not discriminatory under New York Human Rights Act); *Lockhart v. Louisiana–Pacific Corp.,* 102 Or.App. 593, 795 P.2d 602 (1990) (private employer's grooming regulations prohibiting males from wearing facial jewelry did not violate Oregon statute); *Albertson's, Inc. v. Washington State Human Rights Comm'n,* 14 Wash.App. 697, 544 P.2d 98 (1976) (private employer's hair-length regulation not discriminatory under Washington statute).

There are a few courts, however, that are of the opposite view. *See, e.g., Idaho Comm'n on Human Rights v. Campbell,* 95 Idaho 215, 506 P.2d 112 (1973) (commission stated claim of violation of state statute by school's hair-length regulation for males); *Jacobs v. Benedict,* 39 Ohio App.2d 141, 316 N.E.2d 898 (1973) (school's hair regulation impermissible because not "necessary" for government of schools, as required by state statute); *see also Riegler v. Holiday Skating Rink, Inc.,* 48 Mich.App. 449, 210 N.W.2d 454 (1973) (skating rink's refusal to admit males with long hair did not violate statute as existed at that time, but could violate statute as

amended to prohibit discrimination on basis of sex). The dissent would follow these cases, but the better reasoned decisions and the history of TEX. CIV. PRAC. & REM.CODE § 106.001(a) compel the conclusion that regulation of the length of male students' hair but not females' is not discrimination "because of sex" within the meaning of the statute.

■ The dissent also seems to conclude that the particular punishment meted out by school officials violated the statute. Just how this is so the dissent does not say. There is no indication from the parties or from the record that the particular punishment chosen had anything to do with the sex of the student. There is no indication that females who violated the dress code to the same degree as Zachariah Toungate received lesser punishment. The dissent is obviously offended by the severity of the punishment but cannot seriously contend that the degree of punishment was "because of sex."

IV

Toungate urges us to reconsider and overrule our decision in *Barber.* We decline to do so.

The United States Supreme Court has never chosen to resolve the issue of the constitutionality of regulation of hair length by schools. We do, however, have some strong hints that the United States Supreme Court has determined that it will not involve itself in hair-length disputes and that hair-length regulations do not jeopardize constitutional rights. One such clue is found in *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Although the Supreme Court held that school officials had violated the First Amendment rights of high school students who were suspended for wearing black armbands in protest of the war in Viet Nam, the Court distinguished the regulation of dress and hair length. The Supreme Court observed that it had "repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional rights, to prescribe and control conduct in the schools." *Id.* at 507,

89 S.Ct. at 737. The *Court* continued, "[o]ur problem lies in the area where students in the exercise of First Amendment Rights collide with the rules of school authorities." *Id.* It then contrasted the peaceable, nondisruptive display of black armbands, which it characterized as "closely akin to 'pure speech'" with "the regulation of the length of skirts or the type of clothing, ... hair style, or deportment." *Id.* at 505, 507–08, 89 S.Ct. at 736, 737. In so doing, the Supreme Court cited the decision in *Ferrell v. Dallas Independent School District,* 392 F.2d 697 (5th Cir.1968), on which we relied in *Barber,* and the decision in *Pugsley v. Sellmeyer,* 158 Ark. 247, 250 S.W. 538 (1923). *Ferrell* held that the prohibition of "'Beatle' type haircuts" for males did not violate the First or Fifth Amendments as applied to the states under the Fourteenth Amendment. *Pugsley* held that a school could deny admission to a female student for wearing face powder in violation of grooming regulations. Accordingly, the Supreme Court has at least implied that it would not strike down hair-length regulations in schools on constitutional grounds.

An indication of the lack of interest of the United States Supreme Court in hair-length matters in schools is the fact that the circuit courts have divided on the constitutionality of such regulations, and the Supreme Court has refused to grant certiorari when presented with the opportunity to resolve the conflict. *See, e.g., Breen v. Kahl,* 419 F.2d 1034 (7th Cir.1969) (striking down hair-length regulation in high school), *cert. denied,* 398 U.S. 937, 90 S.Ct. 1836, 26 L.Ed.2d 268 (1970); *Ferrell,* 392 F.2d 697 (upholding hairlength regulations in high school), *cert. denied,* 393 U.S. 856, 89 S.Ct. 98, 21 L.Ed.2d 125 (1968).

Finally, as we observed in *Barber,* Justice Black refused to vacate the stay of an injunction that had prohibited El Paso school authorities from enforcing hair-length policies. 901 S.W.2d at 450 (citing *Karr v. Schmidt,* 401 U.S. 1201, 1202–03, 91 S.Ct. 592, 593, 27 L.Ed.2d 797 (1971)). Justice Black imparted this wisdom:

> The motion in this case is ... calculated to leave the impression that this case over the length of hair has created or is about to

create a great national "crisis." I confess my inability to understand how anyone would thus classify this hair length case. The only thing about it that borders on the serious to me is the idea that anyone should think the Federal Constitution imposes on the United States courts the burden of supervising the length of hair that public school students should wear.

*Karr,* 401 U.S. at 1202–03, 91 S.Ct. at 593.

This Court correctly held that "this statement is no less applicable to the Texas Constitution and state courts." *Barber,* 901 S.W.2d at 450. Our state courts should not become the arbiters of constitutional challenges to hair-length regulations in schools.

\* \* \* \* \*

For these reasons, we reverse the judgment of the court of appeals and render judgment for BISD.

BAKER, Justice, joined by ENOCH, Justice, concurring.

I concur in the Court's judgment. However, I write separately because, regardless of whether a student asserts a statutory or constitutional right, this Court should not involve itself in hair length disputes. *See Barber v. Colorado Indep. Sch. Dist.,* 901 S.W.2d 447, 451 (Tex.1995).

### Section 106.001a—The Anti–Discrimination Statute

First, I believe that, in addition to what the majority states, *Barber* also precludes Toungate's statutory claim. Section 106.001 states:

> An officer or employee of the state or of a political subdivision of the state who is acting or purporting to act in an official capacity may not, because of a person's race, religion, color, sex, or national origin:
>
> ...
>
> (4) refuse to permit the person to participate in a program owned, operated, or managed by or on behalf of the state or a political subdivision of the state;
>
> (5) refuse to grant a benefit to the person; [or]

(6) impose an unreasonable burden on the person. . . .

Tex. Civ. Prac. & Rem.Code Ann. § 106.001(a). Similarly, the Equal Rights Amendment states: "Equality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin. . . ." Tex. Const. art. I, § 3a. From my reading of the statute, I do not believe that the Legislature intended § 106.001 to create a cause of action for hair length disputes. While *Barber* deals with a constitutional challenge, its reasoning equally applies to a statutory challenge. The Court in *Barber* held that the state judiciary is less competent to deal with students' hair length than a parent, school board, administrator, principal, or teacher. Therefore, for the same reasons that the Constitution does not afford Toungate a remedy, I believe that Toungate does not have a cause of action under the statute.

Second, the court of appeals held that § 106.001 is not merely an extension of the Texas Equal Rights Amendment. The court concluded that § 106.001 has a pedigree independent of the Equal Rights Amendment because the Legislature enacted § 106.001's predecessor, article 6252–16, § 1, to further implement the 1964 Civil Rights Act. I disagree with this conclusion.

Section 106.001's prohibition on sex discrimination does not have a separate pedigree from the Equal Rights Amendment. Article 6252–16, § 1 only protected against invidious discrimination on the basis of race, religion, color, or national origin. *See* Act of April 18, 1967, 60th Leg., R.S., ch. 72, § 1, 1967 Tex. Gen. Laws 138, *amended by* Act of June 15, 1971, 62nd Leg., R.S., ch. 989, § 1, 1971 Tex. Gen. Laws 2994. In 1971, the Legislature amended this article to include sex as a protected class. *See* Tex. Civ. Prac. & Rem.Code Ann. § 106.001. The same Legislature proposed the Equal Rights Amendment. *See* Tex. S.J. Res. 16, 62nd Leg., R.S., 1971 Tex. Gen. Laws 4129. Therefore, the Legislature considered and passed § 106.001's prohibition on sex discrimination

and the Equal Rights Amendment in the same session. When the Legislature enacts two acts in the same session, we read the acts together. *See Garrett v. Mercantile Nat'l Bank*, 140 Tex. 394, 168 S.W.2d 636, 637 (1943); *General Southwestern Corp. v. State*, 333 S.W.2d 164, 170 (Tex.Civ.App.— Houston 1960, writ ref'd n.r.e.). Reading the two together, I conclude that the Legislature enacted § 106.001's protections against sex discrimination to further the Equal Rights Amendment's policies. In this case involving hair length disputes, the statute does not rise above the Constitution.

Accordingly, I concur in the Court's judgment.

SPECTOR, Justice, dissenting.

Eight-year-old Zachariah Toungate was severely punished for breaking a school district rule that violated state law. The school district argues essentially that rules are rules, and they must be obeyed. September Toungate, Zachariah's mother, contends that school rules must be reasonable and conform to the laws of the state. Both parties are now before this Court, and the Court holds that the relevant state statute does not apply to school district hair-length policies. I dissent.

## I.

In 1989, first-grade student Zachariah Toungate began growing a small "tail" of hair on the back of his head. He wanted to look like his father, a Navy veteran who had worn a ponytail for some fifteen years. By the time Zach entered second grade at Mina Elementary School, his tail had grown to four inches and extended just below his shirt collar. Nonetheless, he successfully and peacefully completed the school year. When Zach returned from summer vacation in 1990 to begin third grade, his tail extended three to four inches below his shirt collar, in violation of the Bastrop Independent School District grooming policy that forbade boys' hair from reaching below the collar.[1] At the be-

---

1. While only the boys' hair-length rule is at issue today, the hair rule, in its entirety, provides: Students are expected to come to school well-groomed and appropriately dressed every day.

Hair will be clean and properly combed, and clothing will be neat and clean. Boys' hair must meet the following guidelines: The rear length must be no longer than to the bottom of

ginning of the school year, Zach was sent home after school one day with a note stating that the length of his hair violated the school dress code.

After discussing the matter with Zach, September Toungate ("Toungate") arranged a meeting with the school's principal, who informed her that the purpose of the rule was to enforce the notion that boys should look like boys and girls should look like girls. The superintendent of the school district later took the position that rules are rules, whether arbitrary or not, and students must follow them. Ultimately, the school board denied her request that it modify or repeal the gender-based hair-length rule.

Following her meeting with the principal, Zach's mother kept her son at home for over a week. She believed that the principal had told her that Zach would not be allowed to return to school unless he cut his hair. When it was determined that this was not the case, Zach returned to school. As punishment, he was placed in "in-school suspension." This suspension required Zach to spend his school day in a twelve-foot by fifteen-foot room with butcher paper covering all the windows. Zach's former classroom teacher communicated his assignments to him by way of a substitute teacher, whom the school district required only to have a high school diploma. There Zach sat day after day for four months, completely alone except for his substitute teacher and the occasional student who had been sent to the room briefly as punishment for other offenses. Zach remained in the windowless room for lunch, took recess by himself, could not participate in music class, and was relegated to watching from the bleachers as his former classmates performed the Christmas pageant. In short, he was denied all meaningful modes of socialization that are afforded to other public school children and play a critical role in their education and development.

## II.

This case concerns a dress and grooming code. Undeniably, dress and grooming codes in schools have many beneficial purposes and are being adopted in public schools across the state. They can legitimately foster unity, self-respect, and pride in appearance; prevent the distraction of immodest or inappropriate attire or attire that might flaunt differences in socioeconomic status; help to maintain classroom discipline by preventing disruptive classroom behavior; and promote safety by banning gang-related clothing or markings. *See generally* Wendy Mahling, Note, *Secondhand Codes: An Analysis of the Constitutionality of Dress Codes in the Public Schools*, 80 MINN. L.REV. 715, 715–21 (1996) (discussing justifications for public school dress codes); Larry D. Bartlett, *Hair & Dress Codes Revisited*, 33 EDUC. LAW REP. 7 (1986) (collecting hair and dress code cases). That dress and grooming codes serve legitimate purposes, however, does not mean that school districts have a license to impose unjustified, discriminatory standards.

Here, Toungate's discriminatory claim is based only on the portion of the Bastrop hair-length policy for which Zach was punished—that portion that distinguishes between the appropriate hair length for boys and girls.

## III.

Toungate claims that Bastrop's hair-length policy violates section 106.001 of the Texas Civil Practice and Remedies Code. The relevant portion of the statute provides:

(a) An officer or employee of the state or of a political subdivision of the state who is acting or purporting to act in an official capacity may not, because of a person's race, religion, color, sex, or national origin:

* * *

(4) refuse to permit the person to participate in a program owned, operated, or managed by or on behalf of the state or a political subdivision of the state;

(5) refuse to grant a benefit to the person; [or]

---

a regular shirt collar. On the sides, the bottom of the earlobe must be visible. In the front, the length cannot be longer than the top of the eyebrows. Afro style is limited to a maximum of 3 inches in length.

(6) impose an unreasonable burden on the person

TEX. CIV. PRAC. & REM.CODE § 106.001(a). We have held that in interpreting a statute, we must follow the clear language of the statute, and seek the intent of the Legislature as found in the plain and common meaning of the words and terms used. *Monsanto Co. v. Cornerstones Mun. Util. Dist.,* 865 S.W.2d 937, 939 (Tex.1993). Because nothing in the clear language of the statute suggests that the Legislature intended to exempt schools from its application, it is necessary to examine Toungate's claim under this statute. Toungate complains that Zach's in-school suspension violated section 106.001 because it imposed an unreasonable burden on Zach and denied him benefits, all because of his sex.

Initially, the threshold question to implicate section 106.001 is whether the unfavorable treatment occurred "because of" Zach's sex. TEX. CIV. PRAC. & REM.CODE § 106.001(a). The school board argues that its treatment of Zach is gender-neutral because it punishes all students, male and female, who violate grooming rules. This argument is specious. There can be no question that the school board's hair-length rule at issue today is not a gender-neutral grooming rule, such as rules requiring cleanliness. Rather, it distinguishes students on the basis of sex: by its own terms, it applies only to boys' hair. *See Reed v. Reed,* 404 U.S. 71, 75, 92 S.Ct. 251, 253–54, 30 L.Ed.2d 225 (1971). Because Zach was punished for violating a hair-length rule that applied only to boys, he was treated differently because of his sex.

The first two statutory provisions concern whether the district refused to permit Zach to participate in a program operated by the state or refused to grant him a benefit. TEX. CIV. PRAC. & REM.CODE § 106.001(a)(4), (a)(5). It is undisputed that the school district forbade Zach from participating in extracurricular activities such as the school Christmas play. In doing so, the district refused to permit him to participate in a program operated by the state. It also refused to grant him the benefit of extracurricular activities.

The district cannot remove certain students from its programs at its whim. These educational components are benefits to the students, the denial of which, based on gender, brings the school district's actions within the purview of section 106.001. Because these benefits were denied because of Zach's sex, Bastrop violated the clear statutory language of 106.001(a)(4) and (a)(5).

Additionally, under (a)(6), the first issue is whether the school district imposed a burden upon Zach. *Id.* § 106.001(a)(6). Toungate asserts that the district burdened Zach by removing him from his regular class and assigning him to in-school suspension for four months, depriving him of recess and lunch with his fellow students, forbidding him from participating in extracurricular activities, and denying him regular classroom interaction with others.

The school district responds that it did not impose a burden on Zach for three reasons. First, it maintains that in-school suspension was a lesser form of punishment than the district was entitled to impose for a repeated violation of a school rule. The fact that the district could have chosen to impose greater punishment does not, however, mean that the punishment imposed—removing him from his classroom and placing him in solitary suspension—was not a burden on Zach.

Second, the district asserts that it did not burden Zach because he received a more favorable student-teacher ratio and better grades in in-school suspension than in his regular classroom. Third, the district asserts that Zach was not burdened because during in-school suspension, in the board's view, he received an appropriate education. Discussing these two reasons together, it is clear that while there was some testimony that Zach's grades may have risen briefly while he was suspended, the record is replete with evidence that he was traumatized by being isolated from other students and removed from extracurricular activities. The district's treatment of Zach was severe enough that he suffered from nightmares and his parents later sent him to psychological counseling. Upon the advice of his counselor, Zach's parents finally removed him from school altogether. These facts establish that

the school district's treatment of Zach imposed a burden on him. *See* Tex. Civ. Prac. & Rem.Code § 106.001(a)(6).

The fact that the school district subjected Zach to burdens because of his gender does not end the inquiry, because not all sex-based treatment is illegal. Once sex-based treatment is proven, the issue becomes whether the school district has a sufficient justification for such treatment. Were this case being decided under the Equal Rights Amendment, Toungate's showing of sex-based treatment would shift the burden to the school district to demonstrate that its treatment of Zach is necessary to protect the district's compelling interest. *In re McLean*, 725 S.W.2d 696, 698 (Tex.1987). Because this case arises under the statute, however, the burden remains with Toungate to demonstrate that the district's treatment of Zach was unreasonable. Tex. Civ. Prac. & Rem. Code § 106.001(a)(6).

The reasonableness of Zach's treatment is assessed by balancing the student's right to freedom from discrimination against the school district's right to determine for itself how to provide a quality education to its students. As the court of appeals noted, "Disruption is the touchstone of this balancing analysis; we must determine whether Zachariah's assertion of his rights disrupts the Board's legitimate education goals." 922 S.W.2d 650, 655. Toungate disputes whether any of the following goals justify Zach's treatment: the need for discipline and a non-disruptive environment, school security, gender identification, and socialization. The hair-length policy and four-month suspension of Zach must be evaluated in terms of their ability to further these goals. Each goal is discussed in turn.

First, discipline is a genuine concern of school administrators, and a nondisruptive environment is of great importance in the schools if the educational process is to be effective. Tex. Educ.Code § 21.301(b)(2) (authorizing in-school suspension for "serious or persistent misbehavior").[2] The district, however, established no connection between hair length and classroom disruption. Class disruption is behavior that "interferes with the teacher's opportunity to present material or the other students' ability to concentrate." State Board of Education Student Discipline Rules § 133.26(a)(1). There was no such interference here. Indeed, Zach completed the second grade with a four-inch tail that never interfered with the learning process in his classroom, and the district's own psychologist testified that having hair below the collar is not disruptive. Moreover, there was no showing that Zach's hair was unclean or unsafe. *Cf. Gere v. Stanley*, 453 F.2d 205 (3d Cir.1971) (holding male student's hair length was a disruption where student kept hair unclean and had habit of dipping his hair in food and flipping it over his head); *Bishop v. Cermenaro*, 355 F.Supp. 1269 (D.Mass.1973) (upholding vocational high school's hair code to insure safety of male students in shop class).

More telling, however, is that there was no evidence of any disruption caused by Zach's hair *before* his suspension. The only disruption occurred *after* he had been suspended and resulted from his being teased by other students. It was only after the school board singled out Zach by punishing him that the

---

**2.** *This section was repealed in 1995, rewritten, and recodified in Chapter 37 of the new Education Code. The old Education Code allowed a school board to place a student in in-school suspension for engaging in "serious or persistent misbehavior that violates" the student's code of conduct. The new Code, in contrast, allows a teacher to remove a student*

    *(1) who has been documented by the teacher to repeatedly interfere with the teacher's ability to communicate effectively with the students in the class or with the ability of the student's classmates to learn; or*

    *(2) whose behavior the teacher determines is so unruly, disruptive, or abusive that it seriously interferes with the teacher's ability to communicate effectively with the students in the class or with the ability of the student's classmates to learn.*

Tex. Educ.Code § 37.002(b). *Thus, under the current statute, suspension of a child for violating a hair-length rule would be legal only if the child is documented as repeatedly interfering with the learning process or the child is extremely unruly, disruptive, or abusive.*

    *While wearing long hair to school every day may qualify as persistent misbehavior justifying in-school suspension under the old Code, it is unlikely that a school district could show that a child's hair length alone warrants in-school suspension under the current statute.*

other elementary school students suddenly "realized" that Zach was a rebellious "outcast" and teased him for it.

Security, the next asserted goal, is not furthered by the hair-length rule. The district claims that the rule prevents the proliferation of gang activity in the district. As the trial court wrote, "Without playing down the significant impact real gangs could have on any school district," the evidence produced at trial demonstrates that there was no gang activity in any elementary school or among boys with tails.

The next proffered goal is gender identification based on hair length. We need not decide if it is always illegal for a school board to establish different dress codes for boys and girls. In this case, however, the reinforcement of the stereotype that "only girls have long hair" is neither positive nor healthy for the child. In short, it is "archaic and overbroad." *Schlesinger v. Ballard*, 419 U.S. 498, 508, 95 S.Ct. 572, 577–78, 42 L.Ed.2d 610 (1975). The facts of this case demonstrate the overbreadth of such stereotypes, because Zach's "girlish" hairstyle was actually a form of male identification in that it mimicked his father's ponytail.

Similarly, in his deposition, Zach stated that eventually he wanted to join the Air Force. In response, at oral argument Bastrop's counsel stated that "it's an appropriate function of the school to teach the student at an early age that Zach, if you want to join the Air Force, you are going to have to cut your hair." The discriminatory effect of this hair-length policy lies in the fact that no like provision applies to the female students similarly situated who might have similar career aspirations. This archaic gender-based distinction is not permitted under the applicable statute.

Next, unquestionably, the hair-length policy is counterproductive to the asserted goal of socialization, or teaching students how to live in society. Rather than teaching that appreciation of human difference is an important social skill, the rule teaches intolerance based on what the school district concedes is a "relatively unimportant" matter. *See* 19

TEX. ADMIN. CODE § 75.32(j)(2)(E) (Tex.Educ.Agency, Curriculum) (requiring, as essential element of third-grade education, that school provide student opportunity to "demonstrate tolerance for and acceptance of others").

As the court of appeals wrote in its prior decision, the fact that the Legislature allows schools to send students to in-school suspension "does not necessarily make it reasonable *in these circumstances.*" *Toungate v. Bastrop Indep. Sch. Dist.,* 842 S.W.2d 823, 827 (Tex.App.—Austin 1992, no writ). Weighing the school district's legitimate educational goals against the district's egregious denial of educational and social benefits to Zach because of his hair length, I would hold that the school district also violated the sex discrimination provisions of section 106.001(a)(6).

## IV.

The Court today, in its analysis of the school district's hair-length regulation, cites cases from other states with statutory language similar to that in section 106.001.[3] The Court, however, conveniently focuses its analysis on cases in the employment context as opposed to the school context. Notably, the seven cases cited by the Court which upheld grooming and hair-length policies in other states with statutes similar to 106.001 all involved an employer's policy regulating the hair length of its employees. *See Pik–Kwik Stores, Inc. v. Commission on Human Rights & Opportunities,* 170 Conn. 327, 365 A.2d 1210 (1976) (employer refusing to hire male interviewee unless he cut his hair); *Indiana Civil Rights Comm'n v. Sutherland Lumber,* 182 Ind.App. 133, 394 N.E.2d 949 (1979) (male employee fired for refusing to shave his mustache); *Bedker v. Domino's Pizza, Inc.,* 195 Mich.App. 725, 491 N.W.2d 275 (1992) (employer firing male employee because his hair fell below his collar); *Planchet v. New Hampshire Hosp.,* 115 N.H. 361, 341 A.2d 267 (1975) (employer dismissing male employee for refusing to cut his hair); *Page Airways of Albany, Inc. v. New York State Div. Of Human Rights,* 50 A.D.2d 83, 376 N.Y.S.2d 32 (1975) (employer firing male

---

3. Significantly, the great majority of the hair-    length cases were decided a quarter-century ago.

employee for violating hair-length policy), *aff'd*, 39 N.Y.2d 877, 386 N.Y.S.2d 223, 352 N.E.2d 140 (N.Y.1976); *Lockhart v. Louisiana–Pacific Corp.*, 102 Or.App. 593, 795 P.2d 602 (1990) (employer firing male employee for violation of policy against facial jewelry on males); *Albertson's, Inc. v. Washington State Human Rights Comm'n*, 14 Wash.App. 697, 544 P.2d 98 (1976) (employer firing male employee for failing to comply with hair-length regulation).

In contrast, both cases cited by the Court holding hair-length policies invalid under statutes similar to 106.001 arose in the school context. *See Idaho Comm'n on Human Rights v. Campbell*, 95 Idaho 215, 506 P.2d 112 (1973) (holding school's hair-length policy violated state statute); *Jacobs v. Benedict*, 39 Ohio App.2d 141, 316 N.E.2d 898 (1973) (same). Obvious differences exist between an employer's interests in a hair-length policy and a school's interest in a similar policy directed to male students.

Employers often have legitimate business reasons for requiring male employees to comply with hair-length regulations. Among them are safety, sanitation, public esteem, and product identification. Further, "[i]f an employee objects to a grooming code, he has a right to reject it by looking elsewhere for employment or, alternatively, he may choose to subordinate his preference by accepting the code along with the job." *Page Airways*, 376 N.Y.S.2d at 33–34 (citing *Willingham v. Macon Tele. Publ'g Co.*, 507 F.2d 1084 (5th Cir.1975)).

Clearly then, an employer may have a legitimate business interest in the appearance of its employees. Equally clear, however, is the fact that the same justifications do not apply in the school context, where school attendance is compulsory. *See* TEX. EDUC. CODE § 25.085. Unfortunately, the Court today chooses to ignore this distinction. Viewing the issue in the right context, it is clear that the Bastrop policy violates section 106.001 of the Texas Civil Practice and Remedies Code.

## V.

Two years ago in *Barber v. Colorado Independent School District*, this Court left it

within the discretion of parents, school administrators, and the Legislature to choose appropriate hair-length policies. 901 S.W.2d 447 (Tex.1995). Sometimes, however, parents and administrators disagree. As the trial judge wrote, "Shame should be heaped generously on both the plaintiff's parents, and school officials for not working out some way to remove the child from [in-school suspension] before it reached the absurd level it did." It became necessary for a court to protect the child caught in the crossfire. This Court has failed to give that protection.

The court of appeals accepted responsibility and correctly held that the school board violated section 106.001 "by imposing an unreasonable burden on Zachariah Toungate on the basis of his gender." 922 S.W.2d at 657. I would affirm that judgment.