**Harold Gene WILLRICH, Appellant,**

v.

**M.D. ANDERSON HOSPITAL AND TUMOR INSTITUTE, The University of Texas System Cancer Center, Appellees.**

No. 13–97–814–CV.

Court of Appeals of Texas, Corpus Christi.

Aug. 31, 1999.

Johnetta S. Cooper, Gordon R. Cooper, Cooper & Cooper, Houston, for Appellant.

Christine Guerra Edwards, Austin, R. Chad Geisler, Asst. Atty. Gen., General Litigation Division, Austin, for Appellees.

Before Justices DORSEY, HINOJOSA, and CHAVEZ.

## OPINION

Opinion by Justice CHAVEZ.

Harold Gene Willrich appeals from a summary judgment granted in favor of his former employer, M.D. Anderson Hospital, on his claim that he was terminated from his employment due to racial discrimination. Willrich contends that the trial court erred in failing to grant him an extension of time to respond to the motion for summary judgment and in ruling that M.D. Anderson had shown as a matter of law that Willrich was terminated for a legitimate, non-discriminatory reason. We hold that material fact issues exist concerning the reason for Willrich's termination, and, therefore, reverse the summary judgment.

The first issue raised by Willrich is whether the trial court erred in failing to grant an extension of time for him to respond to M.D. Anderson's motion for summary judgment. The granting or denial of a motion for extension of time is a matter reserved to the discretion of the trial court. *See Manges v. Astra Bar, Inc.,* 596 S.W.2d 605, 612 (Tex.Civ.App.— Corpus Christi 1980, writ ref'd n.r.e.) (request for continuance under summary

judgment rule is matter within trial court's discretion). M.D. Anderson's motion for summary judgment was filed May 15, 1997. Under Texas Rule of Civil Procedure 166(a)(c), a hearing could not be conducted until at least twenty-one days after the motion was filed, and Willrich's response was due seven days before the hearing. Tex.R. Civ. P. 166(a)(c). In accordance with the rule, a hearing on the motion was set for June 9, 1997, and Willrich's response was due June 2, 1997.

The sole basis for Willrich's motion for extension of time was that he had not received a copy of Willrich's deposition until May 29, 1997. However, a complete copy of Willrich's deposition was attached to M.D. Anderson's motion for summary judgment, which was filed and served on May 15. We hold that the trial court did not abuse its discretion in failing to grant Willrich's motion for extension of time.

■ We next consider whether the trial court erred in granting summary judgment in M.D. Anderson's favor. A defendant who moves for summary judgment has the burden of either establishing a defense as a matter of law or disproving as a matter of law at least one element of each of the plaintiff's causes of action. *Rosas v. Buddie's Food Store*, 518 S.W.2d 534, 537 (Tex.1975). When reviewing a motion for summary judgment, the court takes the non-movant's evidence as true, indulges every reasonable inference in favor of the non-movant, and resolves all doubts in favor of the non-movant. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985).

■ Willrich sued under the Texas Commission of Human Rights Act, which provides for the execution of Title VII of the Civil Rights Act of 1964. Tex. Lab. Code Ann. § 21.001 (Vernon 1996). These laws prohibit discrimination on the basis of race, color, religion, sex, or national origin. 42 U.S.C.A. § 2000e-2(a) (West 1994); Tex. Lab.Code Ann. § 21.051 (Vernon 1996).[1] The plaintiff in a racial discrimination case must carry the initial burden of establishing a prima facie case of racial discrimination by showing that he belongs to a racial minority and that his employer took adverse action against him. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803–805, 93 S.Ct. 1817, 1824 (1973). The burden then shifts to the employer to produce evidence of some legitimate, non-discriminatory reason for the employee's rejection. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). The plaintiff then has the burden of proving that the non-discriminatory reason is a pre-text, and that race is the true reason for the adverse employment decision. *Id.*

Although Willrich failed to respond to the motion for summary judgment, his version of the facts of the case is apparent from his deposition and responses to interrogatories attached to M.D. Anderson's motion for summary judgment. Willrich had worked as a utility station operator for M.D. Anderson since June 1981. He testified in his deposition that "the 'n' word" (nigger) was "a very common phrase." At some point in 1981 Willrich complained about the use of this slur by a coworker named Renstead. As a result of his complaint Willrich was considered a "troublemaker," "taboo," and someone with "a chip on his shoulder."

In 1982 an employee was needed for the night shift, and Willrich was selected against his will. Willrich was the only African–American among those who could do the night shift job, and he believed he was selected because of his race. Willrich

1. Federal case law applying Title VII is persuasive for cases brought under section 21 of the Texas Labor Code. *Board of Trustees of Bastrop Indep. Sch. Dist. v. Toungate*, 958 S.W.2d 365, 370 (Tex.1997); *Price v. Philadelphia Am. Life Ins. Co.*, 934 S.W.2d 771, 773– 74 (Tex.App.—Hous. [14th Dist.] 1996, no writ); *see also* William Conover Brooks, III, *Jurisdictional and Procedural Issues Under the Texas Commission on Human Rights Act*, 47 Baylor L. Rev. 683, 691–92 (1995).

testified that the man he replaced was classified as a "Maintenance Worker II," while Willrich had the higher classification of "Utility Station Operator III." Willrich explained that other maintenance workers could have filled the night shift position, and that it had previously been the custom for the utility station operator to work the day shift, but, nevertheless, he was the one put on the night shift. He complained about his change in shifts to people "outside the department," which angered his supervisor and caused Willrich to be placed on ninety days "probation."[2]

In 1983 Willrich was transferred from M.D. Anderson's hospital facility to its rehabilitation facility. Willrich recounted an incident at the rehabilitation facility where his supervisor, Ernest Landgrebe, told a joke that had the word "nigger" in the punch line. Willrich did not complain, however, because Landgrebe was his boss and he didn't want to repeat the troubles he had earlier when he had complained. In 1990 Landgrebe referred to poor workmanship as "nigger-rigging" and Willrich did file a grievance. Landgrebe apologized, but Willrich did not feel that Landgrebe's apology was sincere because, soon after this incident, Landgrebe gave Willrich an oral evaluation that his work was unsatisfactory and Landgrebe's attitude toward Willrich became hostile. Pressed to recall other incidents where racial slurs had been used, Willrich recalled being the butt of a joke involving the word "nigger" told by a coworker named Lu Pen Lu; coworker John Goodman discussing rap music in a manner that included the word "nigger;" and one other incident where Lu had called him a "nigger."[3] Willrich said that Lu was directed to apologize to him, but he did not consider the apology sincere because Lu had a "catty grin" while apologizing.

Attached to M.D. Anderson's motion for summary judgment were materials that it argued demonstrated legitimate, non-discriminatory reasons for Willrich's termination. Howard Stanford, director of M.D. Anderson's research and education facilities, swore an affidavit stating that Willrich was terminated because his former position was eliminated under the reorganization, and because Willrich was not the best qualified for the jobs he specified on his preference sheet. He added that the only jobs Willrich listed on his preference sheet were night jobs, which were the least available.

M.D. Anderson also attached its "Reduction in Force Policy" which specified that the criteria for determining terminations were past job performance, the ability to perform work required in the future, and when all else was equal, seniority.

The preference form employees were given had spaces for three preferences, and left blanks for employees to specify "department," "section," "position," and "shift." A memorandum sent to M.D. Anderson employees explaining the "facilities management restructuring" and the accompanying "reduction in force" told employees that they could specify a position which would constitute a promotion, but that they must specify at least one position in their current classification. The memorandum also explained: "while we will try to comply with your preference, we cannot guarantee we will be able to do so. If everyone applies for certain positions, and not for others, then we may have to assign you to a position that you didn't indicate on your form." Instructions accompanying the form also told employees:

> Your preferences will be carefully considered and weighed against departmental needs. However, it is possible that

**2.** The nature of this "probation" is not clear.

**3.** M.D. Anderson argues that Willrich recalled only four specific instances where racial slurs were used. We count six: (1) Renstead in 1981, (2) Landgrebe's joke, (3) Landgrebe's "nigger-rigging" comment, (4) Lu's joke, (5) Goodman's discussion of rap music, and (6) Lu calling Willrich a "nigger."

you will be selected for a position other than your preferences. It is also possible that you may not be selected for any position. If you fail to return the preference form, you may be assigned to any position which needs to be filled.

Statistics pertaining to the reduction in force indicated that 24% of African–American employees lost their jobs, compared to 15% of white employees.

M.D. Anderson's motion for summary judgment argued that it had produced evidence of legitimate, non-discriminatory reasons for Willrich's termination, and Willrich failed to raise an issue of material fact concerning whether the alleged non-discriminatory reasons were a pretext for illegal racial discrimination. We hold that a fact issue does exist regarding whether Willrich was terminated for racial reasons.

Willrich's testimony showed that several people at M.D. Anderson, including a supervisor, used racial slurs. Viewing this evidence in the light most favorable to Willrich and indulging all reasonable inferences in his favor, it could be inferred that many individuals at M.D. Anderson, including supervisory personnel, held racist beliefs and were capable of racial discrimination. Willrich's testimony that complaining about the racial slurs led to him being ostracized and labeled a troublemaker by many of his coworkers supports an inference that racist attitudes extended beyond the small group of individuals Willrich recalled hearing use racial slurs. An inference that M.D. Anderson discriminated based on race is also supported by the incident when a maintenance worker retired and Willrich, who had a higher job classification but was the only available African–American, was moved to the night shift; while others, who were not African–Americans but were maintenance workers, kept their positions on the day shift. Finally, while the disparity between the percentage of African–Americans terminated and the percentage of whites terminated is hardly overwhelming, it does show that a higher percentage of African–Americans

were terminated, providing further evidence that race may have been behind Willrich's termination.

M.D. Anderson's argument is also undermined by the disparity between the intended use of the preference forms described in the instructions given to employees and the actual handling of those forms described in Howard Stanford's affidavit. The instructions given to employees indicated they should expect that, in case they were not the best qualified person for the jobs they expressed a preference for, they would be considered for other positions with M.D. Anderson. They were also advised that employees who failed to submit a preference sheet would be considered for "any position which needs to be filled." Yet Stanford's affidavit indicates that, once it was determined that Willrich was not the best qualified person for the jobs on his preference sheet, Willrich was designated for termination. If, as Stanford's affidavit states, the night shift positions Willrich specified were the "least available," then Willrich should have been considered for other positions. Stanford's affidavit does not indicate that this was done.

M.D. Anderson argued in its motion for summary judgment that Willrich limited his chances by narrowly specifying his preferences and specifying positions that were promotions, while other employees wrote "any shift" on their preference forms, or specified positions that were demotions. This argument, like Stanford's affidavit, is at odds with the instructions and design of the preference form. The form had blanks for employees to specify "department," "section," "position," and "shift." Certainly Willrich cannot be faulted for filling in the blanks provided. The instructions indicated that employees who did not get their "preferred" jobs would be considered for other jobs. Indeed, the word "preference" means "one that is liked better or best." WEBSTER'S COLLEGIATE DICTIONARY 918 (10th ed.1996). Therefore, the design of the form and the accompany-

ing instructions suggested that employees could safely specify the jobs they "liked better or best," and that it was unnecessary for an employees to specify that they would be available for "any shift," or to indicate that they would accept a demotion. The irregularity in the actual use of the preference forms undermines the legitimacy of M.D. Anderson's termination of Willrich, and leaves open the possibility that other factors, such as the racism asserted by Willrich, may have caused the decision to terminate him.

M.D. Anderson relies on *Johnson v. Bunny Bread Co.*, 646 F.2d 1250 (8th Cir. 1981) as authority that a limited number of racial slurs, like those detailed by Willrich, do not constitute a violation of Title VII. However, *Johnson* is distinguishable in several important ways. First, *Johnson* was before the Eighth Circuit on appeal from a judgment in favor of the employer rendered after a bench trial. In that posture, the appellate court was required to "give regard to the opportunity of . . . [the trial] court to judge the credibility of the witnesses" and "to resolve conflicts in the testimony." *Id.* at 1253. In contrast, in reviewing the summary judgment before us, we must take the losing party's evidence as true, indulge every reasonable inference in favor of the losing party, and resolve all doubts in that party's favor. *Nixon*, 690 S.W.2d at 548–49. In reviewing the judgment following a bench trial, the Eighth Circuit would affirm the judgment of the trial court unless it found that the trial court's judgment was "clearly erroneous." *Johnson*, 646 F.2d at 1254. However, we may affirm the judgment of the trial court only if M.D. Anderson has shown its entitlement to judgment as a matter of law, and no question of fact exists. *Swilley v. Hughes*, 488 S.W.2d 64, 67 (Tex.1972).

Furthermore, the plaintiffs in *Johnson* alleged that the racial slurs they were subjected to, in and of themselves, constituted a discriminatory working condition violative of Title VII. Willrich does not make this claim. Rather, he argues that the racial slurs are evidence of racist attitudes at M.D. Anderson, and, therefore, evidence that race was a motivating factor in his termination. A limited number of racial slurs might constitute enough evidence to raise a fact issue regarding racist attitudes and racist employment decisions (Willrich's claim) while not being enough to show, as the appellant tried in *Johnson*, that the slurs were such strong evidence of a hostile work environment that a trial judgment in favor of the employer was clearly erroneous.

We do not hold that any time a racial slur is used in a workplace and a minority employee is later terminated, an issue of fact is raised regarding whether race was the cause of the minority's termination. However, where, as here, (1) a supervisor engages in racial slurs; (2) a minority's complaint about racial slurs leads to ostracism among many employees; (3) there is evidence of other incidents where the minority was subjected to adverse treatment and the circumstances suggest that race may have been the motivation (in this case, Willrich's transfer to the night shift); and (4) the employer's asserted race-neutral procedures do not appear to have been followed, and the irregularity has an adverse impact on the minority (in this case, the apparent failure to consider Willrich for jobs other than those on his preference form); we hold that a material fact issue has been raised regarding whether the employee was terminated because of his race.

We reverse the judgment of the trial court and remand this case for further proceedings.

Dissenting Opinion by Justice J. BONNER DORSEY.

Dissenting Opinion by Justice DORSEY.

Because I do not find that Willrich has raised a genuine issue of fact concerning whether M.D. Anderson terminated him because of his race, I dissent. Once M.D.

Anderson articulated a legitimate nondiscriminatory reason for Willrich's termination, the burden shifted to Willrich to present evidence which raised a genuine issue of material fact regarding whether M.D. Anderson's reason was a mere pretext for discrimination. I do not believe that Willrich met this burden.

Willrich failed to respond to M.D. Anderson's motion for summary judgment. Thus, the scope of this court's review is limited. While a party is not required to respond to a motion for summary judgment, failure to respond limits the issues the nonresponding party can raise on appeal if summary judgment is granted. *Kelley–Coppedge, Inc. v. Highlands Ins. Co.,* 980 S.W.2d 462, 467 (Tex.1998); *McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 343 (Tex.1993); *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 676 (Tex.1979). An issue not presented in a response to a motion for summary judgment cannot later be raised on appeal. *Kelley–Coppedge, Inc.,* 980 S.W.2d at 467; *McConnell,* 858 S.W.2d at 343; *Clear Creek Basin Auth.,* 589 S.W.2d at 676. Neither the trial court nor the court of appeals has the duty to sift through the summary judgment record to see if there are other issues of law or fact that could have been raised by the nonmovant in response but were not. *McCord v. Memorial Med. Center Hosp.,* 750 S.W.2d 362, 364 (Tex.App.—Corpus Christi 1988, no writ).

Summary judgments must stand or fall on their own merits, and the nonmovant's failure to answer or respond cannot supply by default the summary judgment proof necessary to establish the movant's right. *Clear Creek Basin,* 589 S.W.2d at 678. Still, when a party fails to respond to a summary judgment, the only issue he may raise on appeal is the legal sufficiency of the motion for summary judgment and the supporting proof. *See McConnell,* 858 S.W.2d at 343; *Clear Creek Basin,* 589 S.W.2d at 678. The proper inquiry on appeal is whether the defendant, in seeking summary judgment, fulfilled his initial burden to: (1) establish as a matter of law that there remains no genuine issue of material fact as to one or more essential elements of the plaintiff's cause of action, or (2) establish his affirmative defense to the plaintiff's cause of action as a matter of law. *Casso v. Brand,* 776 S.W.2d 551, 556 (Tex.1989); *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex. 1985); *Swilley v. Hughes,* 488 S.W.2d 64, 67 (Tex.1972). Still, all reasonable inferences must be drawn in favor of the plaintiff, and evidence favorable to him must be taken as true. *Nixon,* 690 S.W.2d at 549.

Thus, in order to defeat M.D. Anderson's summary judgment, Willrich would have been required to point to a genuine issue of material fact on the question of whether M.D. Anderson's articulated nondiscriminatory reasons for firing him were a mere pretext. Assuming Willrich made out his prima facie case of discrimination, the burden shifted to M.D. Anderson to articulate a legitimate nondiscriminatory reason for Willrich's termination. When M.D. Anderson articulated its reason in its motion for summary judgment, the presumption of discrimination raised by Willrich's prima facie case was rebutted and dropped from the case. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). At this point the burden shifted to Willrich to prove that M.D. Anderson's proffered reason was a pretext for discriminatory conduct. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Willrich could have met this burden by either proving that a discriminatory reason more likely motivated M.D. Anderson in terminating Willrich or by showing that M.D. Anderson's proffered reason was unworthy of credence. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The ultimate burden of showing that M.D. Anderson engaged in intentionally discriminatory conduct remained at all

times with Willrich. *See Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

I find no genuine issue of material fact regarding whether M.D. Anderson's reasons were pretextual. Willrich was hired as a Utilities Station Operator by M.D. Anderson in 1981. During the course of his fourteen year career with M.D. Anderson, he claims he was subjected to five or six occasions where co-workers made racial slurs which he alleges amounted to racial discrimination. Willrich made formal complaints about the slurs a couple of times, and M.D. Anderson responded appropriately. Willrich also contends that in 1995 he was fired because of his race. M.D. Anderson responded to Willrich in its motion for summary judgment by articulating a legitimate nondiscriminatory reason for terminating Willrich.

In support of its motion, M.D. Anderson offered the affidavit of Howard W. Stanford, Director of the Research and Education Facilities. Stanford testified in his affidavit that Willrich had lost his job pursuant to a reduction-in-force (RIF) at the Facilities Management Division which affected thirty-five employees. The purpose of the RIF was to streamline the division and save money. In conducting the RIF, a panel consisting of six directors was appointed to devise a reorganization plan. Stanford served as one of these directors. Under the reorganization plan, all current positions were eliminated and an entirely new organization was created with new positions.

The panel then staffed the new organization based on the personnel files of existing employees. Consideration was given to experience, education, evaluations, performance, disciplinary record and the preference forms submitted by each employee. Rather than selecting employees to terminate, the panel staffed the newly created positions by using the personnel files of existing employees. The employees not placed after all the newly created positions were filled were subject to termination.

The staffing decisions were made during a two-day selection process. None of Willrich's current or former supervisors had any input into the selection process, and none of the panel members knew him. The directors were not allowed to inquire about employees during the selection process. Stanford states that Willrich was terminated because his former position was completely eliminated from the organization, and he was not selected for a position in the new organization because he was not the most qualified candidate for the three positions he listed on his preference form, all of which were night positions. Night positions were the least available, according to Stanford.

M.D. Anderson also attached to its summary judgment motion its April 1995 Reduction–in–Force Policy, which detailed the company's plan for implementation of fair RIF plans that ensure retention of the most effective employees and that all termination decisions are made without regard to race, color, national origin, religion, sex, age, veteran's status or disability. Unlike the majority, I find no irregularity in the implementation of the RIF policy that undermines the credibility of M.D. Anderson's articulated nondiscriminatory reasons for terminating Willrich that raise a genuine issue of material fact. The RIF policy states that factors to be considered in determining whether an employee would be displaced under a reduction-in-force were past job performance, anticipated future job performance, and, in cases where those things were equal between employees in the same position, seniority.

Willrich's termination fell under section 2(b) of the company RIF policy, which states that if a position is eliminated that is currently filled, the employee "falls under the provision of the RIF policy and will be eligible to receive notice in accordance with the Supplemental Notice Policy." The policy requires that the responsible manager submit a written statement of the rationale for and impact of the planned

reduction-in-force on each employee to be displaced. Also, the RIF policy provided a mandatory fourteen (14) day notice to displaced employees. Importantly, the policy expressly provided that:

> [E]mployees terminated as a result of a RIF will have no displacement ('bumping') or reassignment rights into any other position. RIF"ed employees, who are otherwise eligible, may post and compete for other positions within the organization. RIF"ed employees have no rights to reinstatement or recall for any position, at any time.

M.D. Anderson also attached a memo from William Daigneau, Associate Vice President and Chief Facilities Officer, which advised the affected employees that their division had been restructured and instructed them to review the new organizational structure and descriptions of new positions. Then, Daigneau asked the employees to assess their own skills and interests in light of the newly created positions and their requirements, and to choose their top three preferred positions. The employees were given the opportunity to discuss with the director of each department or with Daigneau himself any aspect of a position and its responsibilities. Daigneau's reason for giving the employees the opportunity to place their preferences into the selection process was because he was "convinced" after the reorganization that "it was best to extend participation in the redesign by allowing every member of [the] organization to determine how they, individually, might contribute to the organization of the future."

The memo outlined certain rules and procedures for submitting employees' preferences:

> First, if you are applying for a position outside your current classification, you must fill out and send in the attached application along with your preference form. All requests for promotions or classification changes will be made based on a review of the qualifications of *all* those applying for a particular posi-

tion. Second, you *must* choose *at least one* position in your current classification as one of your preferences, if one exists.

Willrich's completed preference form was also attached to M.D. Anderson's motion.

Another informational letter distributed to all employees affected by the reorganization was attached to M.D. Anderson's motion which emphasized the procedures they should follow in selecting their preferences. This document states that "preferences will be carefully considered and weighted [sic] against departmental needs. However it is possible that you will be selected for a position other than your preferences. It is also possible that you may not be selected for any position." While this form does state that failure to return a preference form may result in an employee being placed in any position that needs to be filled, it also expressly notes that "[d]uring the reorganization, some current positions will be eliminated while new positions will be created. Therefore, in all likelihood, some employees will be RIF"d while there may also be new hires."

By letter dated August 2, 1995, M.D. Anderson notified Willrich that his position had been eliminated pursuant to the reduction in force. Willrich admitted in his deposition, made a part of M.D. Anderson's summary judgment evidence, that he did not know who made the decision to terminate him or how that decision was made. I find that Willrich's evidence that he was terminated due to race amounts to nothing more than his own subjective beliefs. In *Rios v. Texas Commerce Bancshares,* this court held that where a plaintiff did not produce any evidence that the employer's motive was discriminatory other than his own "subjective beliefs," he could not survive summary judgment. 930 S.W.2d 809, 818 (Tex. App.—Corpus Christi 1996, writ denied). Both federal and state courts have uniformly held that a mere showing of "subjective beliefs" of discrimination is insufficient for a plaintiff to survive summary

judgment. *See Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 42 (5th Cir.1996); *Waggoner v. City of Garland, Tex.*, 987 F.2d 1160, 1166 (5th Cir.1993); *Montgomery v. Trinity Indep. Sch. Dist.*, 809 F.2d 1058, 1061 (5th Cir.1987); *Sherrod v. Sears, Roebuck & Co.*, 785 F.2d 1312, 1315–16 (5th Cir.1986); *Hornsby v. Conoco, Inc.*, 777 F.2d 243, 246–47 (5th Cir. 1985); *Azubuike v. Fiesta Mart, Inc.*, 970 S.W.2d 60, 64 (Tex.App.—Houston [14th Dist.] 1998, no pet. h.); *Rios*, 930 S.W.2d at 818; *Farrington v. Sysco Food Services, Inc.*, 865 S.W.2d 247, 251 (Tex.App.—Houston [1 st Dist.] 1993, writ denied). I do not find any evidence upon which a rational juror could base an inference that M.D. Anderson terminated Willrich due to his race.

Further, by not responding to M.D. Anderson's motion for summary judgment, Willrich failed to present the issue of pretext to this court. When a defendant in an employment discrimination case brings forth summary judgment evidence of a legitimate non-discriminatory reason for the adverse job action, the plaintiff can survive summary judgment by raising a fact issue that the stated reason was a mere pretext for discrimination. Because Willrich failed to respond to the motion, though, he did not raise the issue of pretext. Therefore, this court is not permitted to reverse the summary judgment on the basis that M.D. Anderson's articulated reason is a mere pretext. Thus, I would uphold the summary judgment granted in favor of M.D. Anderson.