The LOW–INCOME WOMEN OF TEXAS, as Represented by Robert Prince, M.D.; Curtis Boyd, M.D.; William Watkins West, Jr., M.D.; The Fairmount Center; The Routh Street Women's Clinic; and Reproductive Health Services, Appellants,

v.

Eric M. BOST, Commissioner of Human Services, in his Official Capacity and his Successors; The Texas Board of Human Services; The Texas Department of Human Services; Charles E. Bell, Commissioner of Health, in his Official Capacity and his Successors; The Texas Board of Health; and The Texas Department of Health, Appellees.

No. 03–98–00209–CV.

Court of Appeals of Texas, Austin.

Dec. 7, 2000.

Heather L. Horton, Asst. Atty. Gen., Austin, for appellees.

Catherine A. Mauzy, Austin, for appellants.

Before Justices JONES, B.A. SMITH and YEAKEL.

BEA ANN SMITH, Justice.

The Low–Income Women of Texas[1] filed a lawsuit[2] against the State to challenge funding restrictions placed on abortion services provided by the State's medical programs for low-income Texans. The restrictions prohibit state funding for abortions except in cases of rape or incest or when necessary to save the life of the mother; funding for essentially all other necessary medical procedures is available if the procedure is "medically necessary." Low–Income Women seek a declaratory judgment that the challenged provisions restricting state funding of medically necessary abortions violate the Texas Constitution. They also request injunctive relief enjoining enforcement of the challenged provisions, as well as costs and attorneys' fees. Competing motions for summary judgment were filed; the trial court granted the State's motion and denied Low–Income Women's motion. Low–Income Women appeal, claiming that the abortion-funding restrictions violate three provisions of the Texas Constitution: (1) the equal protection clause; (2) privacy guarantees; and (3) the Equal Rights Amendment (ERA). We will vacate the judgment

1. Low–Income Women are represented in this lawsuit by Robert Prince, M.D.; Curtis Boyd, M.D.; William Watkins West, Jr., M.D.; The Fairmount Center; The Routh Street Women's Clinic; and Reproductive Health Services.

2. By a Rule 11 agreement submitted to the district court prior to trial, Low–Income Women agreed to drop all claims against defendants Eric M. Bost, the Texas Board of Human Services, and the Texas Department of Human Services, "as these defendants do not administer the challenged programs and have no impact upon the issues presented in this case." See Tex.R.Civ.P. 11. The remaining defendants/appellees are current Commissioner of Health Charles E. Bell, the Texas Board of Health, and the Texas Department of Health. We will refer to defendants collectively as "the State."

and dismiss any claim concerning the currently unfunded Maternal and Infant Health Improvement Act (Maternal/Infant Health Act). Because we agree that the Medicaid funding restrictions violate the ERA, we will reverse the judgment of the trial court and render judgment granting Low–Income Women's motion for summary judgment. We will remand the cause to the trial court solely for consideration of the Low–Income Women's request for costs and attorneys' fees.

## FACTUAL AND PROCEDURAL BACKGROUND

### Statutory Framework

The lawsuit filed by Low–Income Women challenges funding restrictions on two Texas programs that subsidize health services for the poor. At issue are the Texas Medical Assistance Program, which is Texas's Medicaid program, and the programs created by the Maternal/Infant Health Act.

The federal Medicaid program was established in 1965 when Congress enacted Title XIX of the Social Security Act. 42 U.S.C.A. §§ 1396–1396v (West 1992 & Supp.2000). Medicaid is a joint federal-state indigent-assistance program that provides federal funds to each state to furnish medical assistance to certain categories of needy persons. *Id.* § 1396 (West 1992). The federal government pays a percentage of the total cost that a partici-

pating state incurs in providing these services. *Id.* § 1396b (West Supp.2000). Federal law establishes mandatory and optional categories of services a participating state may provide under Medicaid. *Id.* §§ 1396a, 1396d(a) (West Supp.2000).

Congress has restricted federal matching funds available for abortions by the annual enactment of the Hyde Amendment. Named for its sponsor, Representative Henry Hyde of Illinois, the Hyde Amendment is a rider to the Labor–HEW Appropriations Act that has been passed every year since 1976.[3] The specific terms of the amendment have varied over the years, but the versions presently in place and in place when this lawsuit was filed prohibit federal reimbursement for abortion services except in cases of rape or incest or where the pregnancy threatens the mother's life.[4] Though the Hyde Amendment prevents states from receiving federal matching funds for most abortion services, states are free to subsidize at their own expense abortions for which federal reimbursement is not available. *Harris v. McRae*, 448 U.S. 297, 311 n. 16, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980); Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999, Pub. Law 105–277, sec. 509(b), 112 Stat. 2681–385 ("Nothing in the preceding section shall be construed as prohibiting the expenditure by a State … of State …

---

**3.** The original version of the Hyde Amendment read: "None of the funds contained in this Act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term." Departments of Labor and Health, Education, and Welfare Appropriation Act, Pub.L. No. 94–439, sec. 209, 90 Stat. 1418 (1976).

**4.** The Hyde Amendment enacted with the 1999 budget reads:

SEC. 508. (a) none of the funds appropriated under this Act, and none of the funds in any trust fund to which funds are appropriated under this Act, shall be expended for any abortion.
. . . .

SEC. 509. (a) The limitations established in the preceding section shall not apply to an abortion—
(1) if the pregnancy is the result of an act of rape or incest; or
(2) in the case where a woman suffers from a physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy itself, that would, as certified by a physician, place the woman in danger of death unless an abortion is performed.
Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999, Pub.L. No. 105–277, sec. 508(a), 509(a), 112 Stat. 2681–385 (1998).

funds (other than a State's ... contribution of Medicaid matching funds).").

Texas has participated in Medicaid almost since the program's inception, passing enabling legislation in 1967 establishing the Medical Assistance Program. *See* Medical Assistance Act of 1967, 60th Leg., R.S., ch. 151, §§ 1–24, 1967 Gen.Laws 310 (Tex.Rev.Civ.Stat.Ann. arts. 695j, 695j–1, since repealed and codified at Tex.Hum. Res.Code Ann. §§ 32.001–.052 (West 1999 & Supp.2000)). The program covers all "health care and related services and benefits authorized or provided under federal law for needy individuals of this state." Tex.Hum.Res.Code Ann. § 32.003 (West Supp.2000). Services are limited, however, to those for which the State can receive federal matching funds. *See id.* § 32.024(e) (West Supp.2000). The Texas Medical Assistance Program therefore tacitly adopts the limits set forth by the Hyde Amendment, and physicians are reimbursed with Medicaid funds only for abortions necessary to save the woman's life or when the pregnancy has resulted from rape or incest. By the State's own admission, every other reproductive health service provided by a doctor with the Texas Medical Assistance Program is reimbursed if it is medically necessary; with one minor exception, abortion is the only service *of any kind* covered by the program that requires a showing of something more than mere medical necessity.[5]

In addition to their Medicaid challenge, Low–Income Women have challenged the abortion funding restrictions found in the Maternal/Infant Health Act. *See* Tex. Health & Safety Code Ann. §§ 32.001–.045 (West 1992 & Supp.2000). This program was created in 1985 to provide medical and educational services to low-income women and infants. *See* Maternal and Infant Health Improvement Act, 69th Leg., R.S., ch. 592, 1985 Tex.Gen.Laws 2224 (Tex.Rev. Civ.Stat.Ann. art. 4447y, since repealed and codified at Tex.Health & Safety Code Ann. §§ 32.001–.045). Under the Maternal/Infant Health Act, no funds may be used to provide abortion services unless the woman's life is in danger. Tex.Health & Safety Code Ann. § 32.005 (West 1992). With no exception for women who are victims of rape or incest, abortion coverage under the Maternal/Infant Health Act is even more restricted than under the Texas Medical Assistance Program.

## The Parties

Low–Income Women are represented in this action by physicians and health clinics that provide abortion services. Doctors Robert Price and Curtis Boyd are both Texas-licensed physicians who divide their time between their private practices and the Fairmount Center, a Dallas health center that provides low-cost, outpatient abortions to Medicaid-eligible women. The physicians and the clinic each assert their own interests and those of their patients, claiming that because of the funding restrictions on medically necessary abortions, many women are forced to delay obtaining an abortion until their second trimester, when the procedure poses greater health risks, because of the time required to find money to pay for a non-subsidized abortion.

Doctor William Watkins West is also a Texas physician who specializes in abortions. He provides services at the Routh Street Women's Clinic in Dallas, also a plaintiff-appellant in this case. Between five and ten percent of Dr. West's Routh Street patients are Medicaid-eligible, and the clinic offers reduced-fee abortions to those women. Finally, Reproductive

---

5. The State's responses to plaintiffs' requests for admission included the following:

No. 15: List any non-experimental reproductive health care services for eligible men that are only covered by the Medical Assistance Program when their lives are endangered.

ANSWER: None

No. 16: List any non-experimental health services, other than abortions, that are provided only when the eligible person's life is endangered.

ANSWER: Limited adult dental services.

Health Services is a non-profit clinic located in Austin that provides abortions, family planning, prenatal care, and other gynecological services. It provides abortions to Medicaid-eligible women. Like the other plaintiffs in this lawsuit, Reproductive Health Services claims that the clinic and the patients it treats are irreparably harmed by the abortion-funding restrictions.

The defendants/appellees in this action are Commissioner of Health Charles E. Bell, the Texas Department of Health, and the Texas Board of Health. While the Human Services Department is designated by statute as the administrator of the Medical Assistance Program, the legislature has also provided that the program may be administered in cooperation with other state agencies. Tex.Hum.Res.Code Ann. §§ 32.003, .021, .023 (West 1990 & Supp.2000). By Rule 11 agreement eliminating as defendants the Human Services Department, Board, and Commissioner, the parties apparently agree that it is the Department of Health that oversees the Medical Assistance Program and that the Department of Human Services is not involved in the administration of the program. *See* Tex.R.Civ.P. 11.

### Medically Necessary Abortions

At issue in this case are abortions that fall in the zone between purely elective abortions and those sought because the pregnancy resulted from rape or incest or jeopardizes the mother's life.[6] Low–Income Women do not argue that low-income Texans have a right to funding for *all* abortions. Instead, they urge that the same standard of medical necessity that applies to all other reproductive health care treatments should apply to abortion services as well.

While abortions are funded when a physician determines that the mother's *life* is threatened by the pregnancy, they are unfunded in other cases, absent rape or incest, in which the physician deems an abortion medically necessary and advisable because of health problems faced by the mother or the fetus. Even a normal pregnancy strains a woman's health, and some conditions increase the risk pregnancy poses to a woman's health so greatly that her doctor may recommend abortion. Low–Income Women detail numerous medical conditions that are caused or exacerbated by pregnancy. The record contains summary judgment evidence that preeclampsia, eclampsia, hypertension, diabetes, congenital heart disease, renal failure, sickle cell anemia, asthma, epilepsy, and cancer are all conditions that may be aggravated or caused by pregnancy and can threaten the mother's *health*, even in situations where they do not immediately jeopardize her *life*. Thus, a pregnancy carried to term may aggravate pre-existing medical conditions or render them untreatable without immediately endangering the life of the mother.

Women who suffer from these conditions face increased health risks. A pregnant woman experiencing hypertension is at a higher risk for strokes or bleeding disorders. Severe, pregnancy-induced forms of hypertension can cause seizures, abdominal pain, and nausea, and may also increase the maternal mortality rate. Pregnant women with diabetes are at a higher risk of developing hypertensive disease and have higher rates of complications and pregnancy-related deaths. Epileptic women experience more frequent seizures and are at a high risk of birthing infants with genetic defects.

Pregnancy can also aggravate pre-existing mental illness, leading doctors to recommend abortion for some women who suffer from such conditions. Nonetheless, the State will not fund those abortions even though pregnancy increases the risk of mental breakdown. Also, many psycho-

---

**6.** These types of abortions are those exempted from the Hyde Amendment's proscription on federal funding for abortion and are thus covered by Medicaid and the Medical Assistance Program.

tropic medications used to treat mental illness pose risks to a fetus, so that a woman who is unable to afford an abortion may be forced to choose between her own mental health and the physical well-being of her fetus. In addition, an unwanted pregnancy can cause an otherwise healthy woman to experience depression, anxiety, and self-destructive behavior, as well as other forms of mental disturbance.

Although physicians may recommend abortion in order to protect the mother's health in any of the above-listed situations, the application of the Hyde Amendment in Texas prevents expenditure of state money on those abortions unless the mother's life is immediately threatened by continuing the pregnancy or unless she was the victim of rape or incest. For virtually any other health treatment, a physician's determination of medical necessity suffices for reimbursement through the Medical Assistance Program. Only when the recommended treatment is abortion is the patient required to demonstrate something more than medical necessity.

## DISCUSSION

■ Low–Income Women and the State each submitted motions for summary judgment, stipulating that there are no material fact issues in dispute. The trial court granted the State's motion. When both sides move for summary judgment and the trial court grants one motion and denies the other, we review the summary judgment evidence presented by both sides and determine all questions presented. *Commissioners Court v. Agan,* 940 S.W.2d 77, 81 (Tex.1997). If we find error, we then render the judgment that the trial court should have rendered. *Id.*

■ As a preliminary matter, the State argues that the claims against the Maternal/Infant Health Act are not ripe because the program is now defunct. Uncontroverted summary judgment evidence was presented that the program has been unfunded and inactive since 1991, and there is no indication that the legislature

ever intends to revive it. Low–Income Women counter that the State could revive the program at any time, and the funding restrictions would again violate the Texas constitution. "At the time a lawsuit is filed, ripeness asks whether the facts have developed sufficiently so that an injury has occurred or is likely to occur, rather than being contingent or remote." *Patterson v. Planned Parenthood,* 971 S.W.2d 439, 442 (Tex.1998). In the present case, Low–Income Women premise their claims against the Maternal/Infant Health Act on the possibility that the legislature will opt to renew funding for this program at some point in the future. With no ripe claim before us, any opinion we might render regarding the Maternal/Infant Health Act abortion funding at this time would be merely advisory. We agree with the State that these claims are not ripe, and we therefore dismiss them. Our opinion will consider only the claims .leveled against the restrictions placed on the State's Medicaid-funded health services.

At the outset, it is important to establish the parameters of this case. Despite the volatile public debate aroused by the subject matter before us, this appeal is not about a woman's right to have an abortion. Low–Income Women do not claim that they have a right to state funding for all abortions. Rather, they claim that by withholding funding for *medically necessary* abortions while funding every other medically necessary reproductive health service for both sexes, the State impermissibly weighs in on a woman's exercise of choice, discriminating against her in the process. As another court has noted, if the legislature had made the opposite policy choice and funded all abortions but refused to fund medical care for poor women who chose childbirth, the same concerns about discriminatory government treatment would arise. *Women of Minn. v. Gomez,* 542 N.W.2d 17, 19 (Minn.1995). Thus, the present case involves only the narrow issue of funding medically necessary abortions and should not be construed

as an overarching comment on the morality of abortion or the existence of a woman's right to choose abortion.

To prevail in this appeal, Low–Income Women must establish in this context that the Texas constitution offers greater protection of individual rights than does its federal counterpart, for it has already been determined that the relief sought by Low–Income Women is not available under the United States Constitution. A challenge similar to the one raised by Low–Income Women was brought under the federal constitution, and the United States Supreme Court held that Congress's refusal to fund medically necessary abortions did not violate the liberty interests recognized by *Roe v. Wade*[7] and its progeny, nor did it violate the First Amendment establishment clause or the Fifth Amendment equal protection clause. *See Harris*, 448 U.S. at 318, 326, 100 S.Ct. 2671. Since that Supreme Court decision, opponents of the Hyde Amendment have challenged abortion-funding restrictions under state constitutions. The majority of states that have examined similar Medicaid funding restrictions have determined that their

state statutes or constitutions offer broader protection of individual rights than does the United States Constitution and have found that medically necessary abortions should be funded if the state also funds medically necessary expenses related to childbirth.[8]

Turning to the challenge brought under the Texas Constitution, Low–Income Women claim that by funding abortion only in the most limited of circumstances, while funding all other childbirth-related services under a less restrictive standard, the State impermissibly interferes with a woman's right to choose whether to have an abortion, thereby violating the right to privacy and the equal protection guarantees of the Texas Constitution, as well as the Equal Rights Amendment. *See* Tex. Const. art. I, §§ 3 (equal protection), 3a (ERA); *Texas State Employees Union v. Texas Dep't of Mental Health & Mental Retardation*, 746 S.W.2d 203, 205 (Tex. 1987) (recognizing that while the Texas Constitution contains no express guarantee of a right to privacy, several provisions in

---

**7.** 410 U.S. at 114, 93 S.Ct. 705 (1973).

**8.** *See Committee to Defend Reprod. Rights v. Myers*, 29 Cal.3d 252, 172 Cal.Rptr. 866, 625 P.2d 779, 798 (Cal.1981) (funding restrictions offended express right to procreative choice in California constitution); *Doe v. Maher*, 40 Conn.Supp. 394, 515 A.2d 134, 135 (1986) (funding restrictions on therapeutic abortions violate statutory provisions of Medicaid program, as well as Connecticut constitutional rights of due process and equal protection); *Moe v. Secretary of Admin. & Fin.*, 382 Mass. 629, 417 N.E.2d 387, 402 (1981) (Medicaid funding restriction impermissibly burdens right to choose abortion protected by Massachusetts constitutional guarantee of due process); *Women of Minn. v. Gomez*, 542 N.W.2d 17, 31 (Minn.1995) (funding restrictions impermissibly infringe upon woman's right to privacy protected by Minnesota constitution); *Right to Choose v. Byrne*, 91 N.J. 287, 450 A.2d 925, 941 (1982) (statute limiting Medicaid funding for abortions violates equal protection right found in New Jersey constitution); *New Mex. Right to Choose/NARAL v. Johnson*, 126 N.M. 788, 975 P.2d 841, 844–45 (N.M.1998) (funding restrictions violate state Equal Rights Amendment); *Women's Health*

*Ctr. v. Panepinto*, 191 W.Va. 436, 446 S.E.2d 658, 667 (1993) (because state must act neutrally when providing medical care for poor, funding restrictions that favor childbirth over abortion infringe on state constitutional rights). *But see Doe v. Department of Soc. Servs.*, 439 Mich. 650, 487 N.W.2d 166, 168 (1992) (prohibition on use of public funds to pay for abortion unless necessary to save mother's life does not violate equal protection guarantees of state constitution); *Hope v. Perales*, 83 N.Y.2d 563, 611 N.Y.S.2d 811, 634 N.E.2d 183, 187–88 (1994) (funding pregnancy-related services but not medically necessary abortions does not violate due process clause of state constitution); *Rosie J. v. North Carolina Dept. of Human Res.*, 347 N.C. 247, 491 S.E.2d 535, 537–38 (1997) (funding scheme that favors childbirth over abortion does not offend North Carolina constitution); *Fischer v. Department of Pub. Welfare*, 509 Pa. 293, 502 A.2d 114, 117–18 (1985) (funding restrictions do not violate equal protection and non-discrimination guarantees or Equal Rights Amendment of Pennsylvania constitution).

the Bill of Rights combine to implicitly create protected "zones of privacy").

Given the occasional inclination of our courts to construe the Texas Constitution more broadly than its federal counterpart, there is possible merit to the argument that the equal protection and privacy guarantees found in the Texas Constitution are stronger than those contained in the federal constitution. *See LeCroy v. Hanlon,* 713 S.W.2d 335, 338 (Tex.1986) ("The federal constitution sets the floor for individual rights; state constitutions establish the ceiling."); *State v. Morales,* 826 S.W.2d 201, 204 (Tex.App.—Austin 1992) ("[T]he Texas Constitution accords individuals greater safeguards to their personal freedom than its federal counterpart does."), *rev'd on other grounds,* 869 S.W.2d 941 (Tex.1994). We do not need to consider these questions, however, because the ERA provides a sufficient basis for resolving this dispute.

### Equal Rights Amendment

The Texas ERA states: "Equality under the law shall not be denied or abridged because of sex, race, color, creed or national origin." Tex. Const. art. I, § 3A. The ERA was overwhelmingly passed by Texas voters, who adopted the amendment by a four-to-one margin on November 7, 1972. *See* William Wayne Kilgarlin and Banks Tarver, *The Equal Rights Amendment: Governmental Action and Individual Liberty,* 68 Tex.L.Rev. 1545 (1990). Because both the United States Constitution and the Texas Constitution had due process and equal protection guarantees before the Texas ERA was adopted, the supreme

court has held that the ERA is "more extensive and provides more specific protection" than those provisions. *In re McLean,* 725 S.W.2d 696, 697–98 (Tex.1987). To construe it otherwise would render the ERA redundant of those pre-existing guarantees and make it meaningless. *Id.*

■■■ The ERA elevates sex—along with race, color, creed, and national origin—to a suspect classification, and any law that classifies persons for different treatment on the basis of sex is subject to strict judicial scrutiny. *Id.* at 698; *Mercer v. Board of Trustees,* 538 S.W.2d 201, 206 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.). A statute that discriminates on the basis of sex violates the ERA unless the State can prove the classification is somehow required by the unique physical characteristics of the sexes.[9] *Mercer,* 538 S.W.2d at 206. If physical characteristics justify the denial of equality, then the State need demonstrate only a rational basis for the statute; otherwise, the State must show there is no less restrictive way to protect a compelling state interest. *See McLean,* 725 S.W.2d at 698; *Mercer,* 538 S.W.2d at 206.

The United States Supreme Court has held that Title XIX does not obligate a state to pay for medical services for which federal reimbursement is not available, but a state may choose to include medically necessary abortions in its Medicaid plan. *Harris v. McRae,* 448 U.S. at 309, 311 n. 16, 100 S.Ct. 2671. Although it is permitted to pay for medically necessary abortions exclusively with state funds, Texas

---

9. Acknowledging that the ERA does permit some limited exceptions to the prohibition on sex discrimination, in addition to the physical-characteristics exception, the *Mercer* court also recognized a defense for sex-based discrimination that is required by other constitutionally protected rights or "other compelling reasons." *Mercer v. Board of Trustees,* 538 S.W.2d 201, 206 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.)

Recently, the fourteenth court of appeals in Houston held section 21.06 of the penal code,

which makes homosexual sodomy a crime, unconstitutional because it violates the ERA. *Lawrence v. State,* No. 14–99–109–CR, slip op. at 8, 2000 WL 729417 (Tex.App.—Houston [14th Dist.] June 8, 2000, no pet.). In so holding, that court held that the state had not shown "other compelling reasons to justify the sex-based discrimination wrought by the statute." *Id.* slip op. at 7. The court did not reach the other *Mercer* exceptions because their applicability was not raised by the state. *Id.* slip op. at 5 n. 3.

has chosen not to do so. Low–Income Women insist that the State's adoption of the Hyde Amendment funding restriction denies Medicaid-eligible women equality of rights by not applying the same standard of medical necessity to men and women.

█ The State initially argues that its refusal to pay for medically necessary abortions does not deny equality under the law. It urges that Texas refuses to fund medically necessary abortions for *all* indigent citizens, regardless of gender. If a man were to require an abortion, the argument goes, the State would refuse to fund the treatment unless his life were in danger. The fallacy of this argument is plain, for at this time it is biologically impossible for a man to become pregnant and require an abortion to protect his health. Under the Texas Medical Assistance Program, the only patient who ever has to demonstrate something more than a medical necessity to receive treatment is a pregnant woman. Every other treatment affecting reproductive health is funded for both sexes if determined to be medically necessary. The Hyde Amendment does not apply equally to men and women.

### Pregnancy Discrimination as Sex Discrimination

The Texas Legislature has plainly stated that in the employment context "discrimination because of sex or on the basis of sex includes discrimination because of or on the basis of pregnancy, childbirth, or a related medical condition." Tex.Lab.Code Ann. § 21.106 (West 1996). The Texas Supreme Court has also indicated that discrimination based on pregnancy is a form of sex-based discrimination prohibited by section 106.001 of the Civil Practice and Remedies Code. *Board of Trustees of Bastrop Indep. Sch. Dist. v. Toungate,* 958 S.W.2d 365, 369 (Tex.1997).

█ *Toungate* involved a challenge to a school's hair-length and grooming code under section 106.001, which prohibits discrimination by a public officer or employee because of race, religion, color, sex, or national origin. *See* Tex.Civ.Prac. & Rem. Code Ann. § 106.001 (West Supp.2000). Examining the legislative history of that statute, the supreme court noted that its predecessor statute had been amended in 1971 to include sex as a prohibited basis for discrimination; this amendment was added during the same legislative session in which the legislature voted to put the ERA on the Texas ballot. *Toungate,* 958 S.W.2d at 369. The court went on to note that a further amendment in 1983 illuminated what the legislature meant by "because of . . . sex." *Id.* Studying the legislative history, the supreme court found that the prohibition against sex discrimination in section 106.001 had been derived from the Human Rights Act, now codified in the Texas Labor Code sections 21.001–.306 (West 1996 & Supp.2000). *Id.* The Human Rights Act provides that sex discrimination includes discrimination based on pregnancy. *Id.;* Tex.Lab.Code Ann. § 21.106. Thus, section 106.001 of the Civil Practice and Remedies Code shares a common origin with the Human Rights Act, and "because of sex" has the same meaning in both codes. *Toungate,* 958 S.W.2d at 369. Further, the court tied the statutory definition of "because of sex" to the legislature's drafting of the ERA, which contains analogous language. *Id.* Accordingly, we hold that the ERA's proclamation that "[e]quality under the law shall not be denied or abridged because of sex" proscribes discrimination on the basis of pregnancy.

We note that our holding is in line with the view of sex discrimination adopted both by Congress and by a majority of states. In 1978, Congress passed the Pregnancy Discrimination Act, amending Title VII of the Civil Rights Act of 1964 to prohibit discrimination on the basis of pregnancy. *See Newport News Shipbuilding & Dry Dock Co. v. EEOC,* 462 U.S. 669, 670, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983). Specifically, the Act states "[t]he terms 'because of sex' or 'on the basis of sex' include . . . because of or on the basis

of pregnancy, childbirth, or related medical conditions." 42 U.S.C.A. § 2000e-(k) (West 1994). The United States Supreme Court noted that Congress passed the Act specifically to overrule that Court's contrary conclusion in *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), that the exclusion of pregnancy-related disabilities from an employer's disability plan did not constitute sex discrimination under Title VII. *Newport News,* 462 U.S. at 678, 103 S.Ct. 2622. Likewise, many state legislatures have enacted similar statutes equating pregnancy discrimination with sex discrimination, and many state courts have interpreted sex-discrimination statutes to include discrimination on the basis of pregnancy.[10]

### Physical–Characteristics Exception

■ Having determined that the state's refusal to pay for medically necessary abortions discriminates against pregnant women and that pregnancy discrimination is a form of sex discrimination, we next inquire whether physical characteristics require—and thus excuse—that sex-based distinction. Unless the proponent of a law can rebut a prima facie ERA case by showing that unique physical characteristics of the sexes require different treatment under the law, we employ a "strict scrutiny" standard in reviewing a challenged statute. *Messina v. State,* 904 S.W.2d 178, 180 (Tex.App.—Dallas 1995, no writ); *Mercer,* 538 S.W.2d at 206.

"For us to adjudicate that women are men would be as futile as it would be absurd. Neither the ERA nor the rights established by it require us to construe it so as to deny sexual or reproductive differences between the sexes." *Mercer* 538 S.W.2d at 206. Nonetheless, it does not suffice to simply say, as the State essentially does, that because only women can get pregnant, physical characteristics require the distinction effected by the Hyde Amendment. If that were the case, discrimination based on pregnancy would *never* constitute sex discrimination, and we know from the cases and statutes that that is not the law.

In 1978, a man accused of rape charged that the criminal statute made it impossible for a woman to be the perpetrator and that this discrimination based on sex violated the Texas ERA. *Finley v. State,* 527 S.W.2d 553, 555 (Tex.Crim.App.1975). The court of criminal appeals agreed that the statute's definition of perpetrator excluded women, but held that the different physical characteristics of the sexes justified the sex-based distinction: "Hymen and uterine injury to female rape victims, the possibility of pregnancy, and the physiological difficulty of a woman forcing a man to have sexual intercourse with her all suggest a justification for the sexual distinction." *Id.* at 556. In relying on this physical-characteristic exception, the court specifically looked for a justifiable link between the classification made on the basis of sex and the legitimate purposes of the statute. The court held that the object of the rape statute was to prevent assaults that are usually perpetrated by men against women, and so the different physical characteristics of the sexes justified the

---

**10.** *See, e.g.,* Alaska Stat. § 18.80.200 (Lexis 1998) (includes sex, pregnancy, and parenthood on list of prohibited bases for discrimination); Cal.Gov't Code § 12926(*o*) (West Supp.1999) ("sex" as defined in discrimination statute includes pregnancy, childbirth, or medical conditions related to pregnancy or childbirth); Me.Rev.Stat.Ann. tit. 5, § 4572–A (West 1989) (sex discrimination includes pregnancy and related medical conditions); N.H.Rev.Stat.Ann. § 354A:7 (1995) (employment discrimination statute includes pregnancy in definition of sex discrimination); *Colorado Civil Rights Comm'n v. Travelers Ins. Co.,* 759 P.2d 1358, 1365 (Colo.1988) (employer violated state ERA and discrimination statute by excluding costs of pregnancy-related medical treatment from benefits plan covering other normal conditions); *Allison–LeBlanc v. Department of Pub. Safety & Corrections,* 671 So.2d 448, 452 (La.Ct.App.1995) (discrimination based on pregnancy is unconstitutional sex discrimination); *Massachusetts Elec. Co. v. Massachusetts Comm'n Against Discrim.,* 375 Mass. 160, 375 N.E.2d 1192, 1199 (1978) (discrimination based on pregnancy is sex discrimination).

sex-based definition of perpetrator in the statute. *See id.*[11]

 Applying *Finley*, we hold that in addition to pointing to a particular physical characteristic that illustrates how the sexes are different, the State must also show that singling out that characteristic furthers the goals of the statute being challenged. Unless the physical-characteristic exception is narrowly and strictly applied, the exception can wholly swallow the ERA's prohibition against discrimination based on sex. The State cannot rebut a discrimination claim simply by showing that the sexes are different; the State must also show that the difference between the sexes necessitates different treatment to accomplish the purposes of the law. Specifically, the State may not defend the discrimination imposed by the Hyde Amendment merely by stating the obvious proposition that only women get pregnant. There must also be some explanation of why the physical characteristics of pregnancy justify or require different health care treatment under the Medicaid law. The State has offered no such explanation.

The Medical Assistance Program was established to "provide medical assistance on behalf of needy individuals" and to ensure that "adequate and high quality health care may be made available to all children and adults who need the care and are not financially able to pay for it." Tex.Hum.Res.Code.Ann. §§ 32.001, .002 (West 1990). The effect of the Hyde Amendment is to deny funding for a type of treatment that a doctor may deem medically necessary. It singles out one particular medical procedure and denies funding for that treatment even when it is medically necessary for the patient's health. There is no physical characteristic peculiar

to pregnant women that justifies the denial of medically necessary care that only women patients require.

Men and women who meet the general criteria regarding their financial and medical needs are similarly situated in their eligibility for Medicaid services. Medically necessary treatment is available to all Medicaid-eligible patients, with one exception: the Hyde Amendment denies funding for medically necessary abortions. This gender-based restriction operates to the disadvantage of women who are otherwise eligible for Medicaid services. We hold that Texas's adoption of the Hyde Amendment singles out for less favorable treatment a gender-linked condition that is unique to women. There is no comparable restriction on medically necessary services relating to physical characteristics that are unique to men. This restriction is not related to the stated purposes of the Texas Medical Assistance Program, which is to offer medical assistance to all qualified needy citizens. More importantly, the physical characteristic of becoming pregnant may have profound consequences on the health of the mother; it may aggravate pre-existing conditions such as heart disease, epilepsy, hypertension, anemia, and may hamper treatment of other serious medical conditions such as cancer. The Hyde Amendment is a classification that operates to the disadvantage of many of the persons the Medicaid program was designed to serve. Because all of the disadvantaged persons are women, we hold that the funding restriction violates the Texas ERA and is not justified by any physical characteristic related to the purpose of the program.

The federal constitution does not require the government to fund a woman's exer-

11. A few years later the court reversed itself by holding that the statutory definition of "sexual intercourse" in the rape statute does not limit the sex of the perpetrator. *See Ex parte Groves*, 571 S.W.2d 888, 892 (Tex.Crim. App.1978). This in no way invalidated the methodology suggested in *Finley* for determining when a physical characteristic will save an otherwise discriminatory statute. To the extent that other courts have failed to apply the *Finley* methodology, we decline to follow them. *See, e.g., MJR's Fare of Dallas, Inc. v. City of Dallas*, 792 S.W.2d 569, 575 (Tex.App.—Dallas 1990, writ denied).

cise of her constitutional right to an abortion. *Harris v. McRae,* 448 U.S. at 317–18, 100 S.Ct. 2671. But when Texas chooses to provide medically necessary services to indigent persons, the ERA mandates that it not do so in a way that discriminates on account of gender.

### Strict Scrutiny

The ERA elevates sex to a suspect classification, and the supreme court has stated that when a classification distinguishes between people on a suspect basis, "the state action is subjected to strict scrutiny, requiring that the classification be narrowly tailored to serve a compelling government interest." *Richards v. League of United Latin Am. Citizens,* 868 S.W.2d 306, 311 (Tex.1993);[12] *see also Lawrence v. State,* —— S.W.3d ——, ——, No. 14–99–109–CR, slip op. at 7, 2000 WL 729417 (Tex.App.—Houston [14th Dist.] June 8, 2000, no pet.) ("[T]he ERA does not yield except to compelling state interests.").

▮ Because the State is unable to show that any unique physical characteristic of the sexes justifies the discriminatory effect of the funding restriction on women seeking medically necessary abortions, we subject the challenged statute to review under the strict scrutiny standard. *See Mercer,* 538 S.W.2d at 206. Under that standard, sex-based discrimination is allowed only if the State can show that it serves a compelling state interest in the least restrictive manner. *See McLean,* 725 S.W.2d at 698; *Mercer,* 538 S.W.2d at 206.

▮ The State urges that it has a legitimate state interest in protecting both fetal and maternal health, and that it may permissibly implement a policy that favors childbirth over abortion to protect those interests. However, the State has not demonstrated how its asserted interest in maternal health is protected by a funding

ban that denies abortions that are medically necessary to preserve maternal health. As for the State's interest in fetal health, it is well established that the State's interest in protecting unborn life is tempered by the mother's individual rights, including the right to protect her own health. *See Planned Parenthood v. Casey,* 505 U.S. 833, 846, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality opinion); *Roe v. Wade,* 410 U.S. 113, 164, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The state's interest in protecting the potential life of the unborn clashes with the woman's fundamental right of procreative choice. In *Roe v. Wade,* the U.S. Supreme Court held that prior to fetal viability, the state may impose regulations on abortion only to protect the health of the mother, not to protect the unborn fetus. *Roe v. Wade,* 410 U.S. at 164–65, 93 S.Ct. 705; *see also Casey,* 505 U.S. at 879, 112 S.Ct. 2791. The *Roe v. Wade* decision held that the state's interest in protecting the fetus becomes compelling only after viability; before that time any interest in the unborn fetus must be balanced against concerns for the mother's health, and the state may not protect the fetus at the expense of the mother's health. *Casey,* 505 U.S. at 879, 112 S.Ct. 2791; *Roe v. Wade,* 410 U.S. at 164–65, 93 S.Ct. 705. By denying funding for abortions that doctors deem medically necessary, the funding restrictions attempt to protect the State's interest in the fetus at the expense of the mother's health and welfare. This is impermissible under the framework of *Roe v. Wade* and *Casey.* *See Casey,* 505 U.S. at 879, 112 S.Ct. 2791; *Roe v. Wade,* 410 U.S. at 164–65, 93 S.Ct. 705. The State must tread more carefully when protecting the interests of the unborn; a blanket ban on funding medically necessary abortions is not narrowly tailored to advance the State's interest. There are less restrictive means available to encourage childbirth over abortion, such

12. *Richards* involved an equal protection challenge. *Richards v. League of United Latin Am. Citizens,* 868 S.W.2d 306 (Tex.1993). Because the supreme court has also acknowl-edged that the ERA elevates sex to a suspect classification, *McLean,* 725 S.W.2d at 698, we apply the same strict scrutiny analysis here.

as continuing to fund prenatal care and childbirth expenses and stepping-up health and education efforts to prevent unwanted pregnancies. These solutions would further the State's interest in encouraging birth over abortion without simultaneously discriminating against women who require an abortion to maintain their health.

Nor can the sex-based discrimination effected by the Hyde Amendment be justified as serving a compelling state fiscal policy. Low–Income Women focus on the fiscal nature of the funding restriction to argue that the only state interest advanced is a funding scheme to limit public expenditures. The State has not established that the savings resulting from not funding medically necessary abortions is greater than the costs associated with the medical expenses the Medicaid-eligible woman would incur in bringing the pregnancy to term or dealing with the costs to her own health in doing so. Low–Income Women point to evidence that carrying a child to term, especially in a problem pregnancy where the mother's health is at risk, is more costly than an abortion. But even if the restriction on funding medically necessary abortions exclusively with state funds would save the State money, the State has pointed to no reason why this fiscal burden must be borne by pregnant women only. A statute seeking to conserve state resources must be narrowly tailored not to deny medically necessary treatment on the basis of sex or pregnancy.

Perhaps most compellingly, there is dissonance between the goal of the Medical Assistance Program and the effect of the funding restrictions. By delaying or preventing women from obtaining a medically necessary treatment, the abortion-funding restriction not only fails to advance the State's interest in providing medical assis-

tance to the needy, it poses an active threat to some women's health. Texas's implicit adoption of the Hyde Amendment does not narrowly serve a compelling state interest.[13]

### Availability of Remedy

■ The State argues that the relief sought by Low–Income Women is barred by a provision in the Texas Constitution that states: "No money shall be drawn from the Treasury but in pursuance of specific appropriations made by law." Tex. Const. art. VIII, § 6. Further, the legislature is barred from granting "by appropriation or otherwise, any amount of money out of the Treasury of the State, to any individual, on a claim, real or pretended, when the same shall not have been provided for by pre-existing law." Tex. Const. art. III, § 44 (West 1997). The State urges that by granting the injunction sought by Low–Income Women, this Court would impermissibly require the Medical Assistance Program to fund abortions where the legislature has not appropriated funds for them and where there is no pre-existing law authorizing such appropriation. We disagree.

The relief sought by Low–Income Women—funding medically necessary abortions—cannot be characterized as a new appropriation. They do not ask for a new appropriation of funds to the Medical Assistance Program. Rather, they seek declaratory and injunctive relief against unconstitutional restrictions placed on the use of funds already appropriated pursuant to a pre-existing law authorizing funds to be used for health care under the program. Therefore, we find no constitutional violation in granting the relief requested.

---

**13.** For these same reasons, we doubt that the funding restrictions on abortion could survive scrutiny even under a rational-basis test. The statutory provisions being challenged are silent as to abortion. In fact, correlative provisions have been in place since the Medical Assistance Program was established in 1967, some nine years before the enactment of the Hyde Amendment. It is therefore difficult for the State to point to abortion policy as the rationale behind the statutory provisions that limit the benefits available under the program.

### Response to the Dissent

In response to the dissent, we do not hold that the ERA creates a constitutional entitlement to funds. Nor do we hold that the ERA makes poverty a suspect classification. Rather we hold that because the ERA elevates sex to a suspect classification, the state legislature may not fund medical services in a manner that has a discriminatory effect on women absent some compelling state interest that is applied in the least restrictive manner. *See McLean*, 725 S.W.2d at 698. We find no compelling state interest that justifies denying medically necessary abortions. Neither does the dissent.

Moreover, the dissent recognizes that the legislature's enactment of the Texas Medical Assistance Program has a disparate impact on women: "Although the impact of these events is felt almost exclusively by indigent women, the ERA does not change the calculus of identifying a suspect classification. Poverty is not a suspect classification in Texas." Post at 706. This might be true if the federal funding restriction disadvantages all indigent Texans equally; it does not. In the face of the restriction's admitted discrimination against poor women, the dissent wrongly asserts that the ERA "does not change our calculus of identifying a suspect classification." What the ERA does is elevate sex to a suspect classification. *Id.* Whether or not sex-based discrimination violates federal equal protection and privacy guarantees, it is subject to strict scrutiny under the Texas ERA. *Id.*

There is no entitlement to funds under the ERA; there is no constitutional obligation to care for the indigent. There is only a mandate to enact programs that do not discriminate against Texans on the basis of sex. The Texas Medical Assistance Program does not discriminate against all indigent Texans; its impact is "felt almost exclusively by indigent wom-

en," and it does not survive strict scrutiny analysis.

### CONCLUSION

Because any claim against the presently unfunded Maternal/Infant Health Act program is not ripe, we vacate that part of the judgment concerning claims against that program and its administrators and dismiss that portion of the cause. We hold that the Medicaid funding scheme that denies funding for medically necessary treatment that is not reimbursed by the federal government effects an impermissible form of sex discrimination against pregnant women. Because the State has not shown that the statutory scheme is narrowly tailored to serve a compelling state interest, we hold that the State's implicit adoption of the Hyde Amendment violates the Texas Equal Rights Amendment. We therefore reverse that portion of the trial court's judgment in favor of the State; we render judgment granting the declaratory and injunctive relief requested in Low–Income Women's motion for summary judgment. We further remand that portion of the cause concerning Low–Income Women's request for costs and attorneys' fees to the trial court for consideration in light of this opinion.

YEAKEL, Justice, dissenting.

I respectfully dissent.

I agree with the majority that this appeal is not about a woman's right to have an abortion. I further agree that there is no ripe claim before us regarding the Maternal/Infant Health Act abortion funding. Where the majority and I part ways is over whether the Texas Legislature, in establishing the Texas Medical Assistance Program,[1] impermissibly discriminated against women on the basis of their sex by devising a plan to accept federal matching funds that are restricted in their use. It is

---

1. *See* Medical Assistance Act of 1967, 60th Leg., R.S., ch. 151, §§ 1–24, 1967 Gen.Laws 310 (Tex.Rev.Civ.Stat.Ann. arts. 695j, 695j–1, since repealed and codified at Tex.Hum.Res. Code Ann. §§ 32.001–.052 (West 1990 & Supp.2000)).

undisputed that services provided pursuant to the Medical Assistance Program are limited to those for which the State can receive federal matching funds. *See* Tex. Hum.Res.Code Ann. § 32.024(e) (West Supp.2000). Nor is it disputed that the "Hyde Amendment," in the form currently before this Court, prohibits reimbursement for abortion services except in cases of rape or incest or where the pregnancy threatens the mother's life. *See* Omnibus Consolidated & Emergency Supplemental Appropriations Act of 1999, Pub.L. No. 105–277, §§ 508(a), 509(a), 112 Stat. 2681, 2681–385 (1998). The question is whether the Equal Rights Amendment to the Texas Constitution compels the legislature to appropriate state funds *beyond* those necessary to entitle the State to receive federal matching funds if the federal funds may not be expended to compensate physicians who perform a medical procedure that can only be performed on a woman. *See* Tex. Const. art. I, § 3a ("Equality under the law shall not be denied or abridged because of sex, race, color, creed or national origin."). Said another way, did the legislature violate the ERA[2] when it did no more than what was minimally required to obtain for the citizens of Texas federal funds that are restricted in their use? Because, unlike the majority, I believe that the legislature acted within the constitution, I respectfully dissent.

The Hyde Amendment violates neither the Due Process nor the Equal Protection Clauses of the United States Constitution. *Harris v. McRae*, 448 U.S. 297, 318, 326, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). The Supreme Court has held that the federal Medicaid assistance program[3] does not compel a participating state to pay for medical services for which federal reimbursement is unavailable by virtue of the

Hyde Amendment.[4] *Id.* at 311, 100 S.Ct. 2671. In addressing the Hyde Amendment, the Court noted that the Due Process Clause "affords protection against unwarranted government interference" but does not compel an "affirmative funding obligation" to subsidize medical procedures for indigent women. *Id.* at 317–18, 100 S.Ct. 2671. The Court also held that the Hyde Amendment does not violate the constitutional guarantee of equal protection because the amendment is not "predicated on a suspect classification." *Id.* at 322–23, 100 S.Ct. 2671. Specifically, the Court observed that "the principal impact of the Hyde Amendment falls on the indigent. But that fact does not itself render the funding restriction constitutionally invalid, for this Court has held repeatedly that poverty, standing alone, is not a suspect classification." *Id.* at 323, 100 S.Ct. 2671 (citing *James v. Valtierra*, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971)); *accord Maher v. Roe*, 432 U.S. 464, 470–71, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977).

In *In re McLean*, the Texas Supreme Court held that the ERA is "more extensive and provides more specific protection than both the United States and Texas due process and equal protection guarantees." 725 S.W.2d 696, 698 (Tex.1987). The court referred generally to the amendment's "added guarantees" and held that the ERA "elevates sex to a suspect classification." *Id.* Because sex is a suspect classification, sex-based discrimination is subject to strict judicial scrutiny. *Id.* "Under [the Texas] model of strict judicial scrutiny, such discrimination is allowed only when the proponent of the discrimination can prove that there is no other manner to protect that state's compelling interest." *Id.* (citing *Mercer v. Board of Trs., N.*

---

**2.** I use "ERA" to mean the sex-equality provision of the Texas Equal Rights Amendment. *See* Tex. Const. art. I, § 3a.

**3.** 42 U.S.C.A. §§ 1396–1396v (West 1992 & Supp.1999).

**4.** The participating state may, however, include unfunded services within its own Medicaid plan. *Harris v. McRae*, 448 U.S. 297, 311 n. 16 (1980); *see also* Omnibus Consolidated & Emergency Supplemental Appropriations Act of 1999, Pub.L. No. 105–277, §§ 509(b), (c), 112 Stat. 2681, 2681–385 (1998).

*Forest ISD,* 538 S.W.2d 201 (Tex.Civ. App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.)).

*McLean* clearly establishes that the tier of scrutiny to be observed by Texas courts in applying the ERA to sex-based-discrimination cases is greater than that recognized by federal courts when applying the Equal Protection Clause of the Fourteenth Amendment to similar cases. "To withstand constitutional challenge, ... classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). The Supreme Court possibly heightened the federal review standard somewhat in *United States v. Virginia* when the Court opined, "Parties who seek to defend gender-based governmental action must demonstrate an 'exceedingly persuasive justification' for that action." 518 U.S. 515, 531, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (citing *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 136–37, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994); *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982)). Whatever the federal standard, *McLean* raised the bar for scrutinizing Texas state action under the ERA and made certain that the ERA has elevated sex to a protected status comparable to race in federal analysis. *See Regents of the Univ. of Cal. v. Bakke,* 438 U.S. 265, 291, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) ("Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial determination."); *Lucas v. United States,* 757 S.W.2d 687, 705 n. 2 (Tex.1988) (Phillips, C.J., dissenting) ("Pursuant to the Equal Rights Amendment, strict scrutiny is ... applied in Texas to all classifications involving the protected classes of sex, race, color, creed and national origin.").

However, *McLean* left for another day identification of the "added guarantees" and in what areas, if any, the ERA is "more extensive" and "provides more specific protection than both the United States and Texas due process and equal protection guarantees." *McLean,* 725 S.W.2d at 698. The majority finds one such area in its holding that the ERA "proscribes discrimination on the basis of pregnancy." *Supra* at 698.

There is no evidence that the legislature set out to design and enact legislation to create a medical-assistance program that prohibited the use of state funds for abortion procedures. Rather, the legislature created the minimum program required to receive federal Medicaid funds. The federal Congress, by means of the Hyde Amendment, has consistently restricted the use of those funds. The majority's holding today means that Texas cannot accept Congress's largesse without appropriating additional funds, beyond those required by Congress, to expand the Medical Assistance Program. The majority finds in the ERA an affirmative obligation for government action. I find no such mandate in the amendment. The amendment is a limitation on the power of the State. It is more specific than the pre-existing equal-protection and due-process guarantees in that it makes clear that these guarantees extend to both sexes. But the Medical Assistance Program does not deny or deprive a woman of any right she had before the program's enactment. Congress offered Medicaid funds to the states with certain restrictions on their use and Texas, through its legislature, accepted them burdened with the restrictions.

The Texas Constitution generally prohibits the legislature from granting "public moneys" to any individual. Tex. Const. art. III, § 51. In order to provide medical care for certain needy persons, the constitution was amended. *See* Tex. Const. art. III, § 51–a interp. commentary (West 1997). The legislature's authorization for the Medical Assistance Program is found in section 51–a of the Texas Constitution: "The Legislature may provide by General Law for medical care ... for needy persons. The Legislature may

prescribe such other eligibility requirements for participation in these programs as it deems appropriate and may make appropriations out of state funds for such purposes." Tex. Const. art. III, § 51–a(b).[5] The constitution further provides that, if section 51–a's "limitations and restrictions" are found to be in conflict with federal law, "then and in that event the Legislature is specifically authorized and empowered to prescribe such limitations and restrictions and enact such laws as may be necessary *in order that such federal matching money will be available for ... medical care for or on behalf of needy persons."* Tex. Const. art. III, § 51–a(c) (emphasis added). Section 51–a specifically provides the constitutional foundation allowing the legislature to seek federal funds for the Medical Assistance Program. In restricting the services provided under the Medical Assistance Program to those for which federal matching funds are available,[6] the legislature acted within the authority granted it by section 51–a.

Thus, the majority's result is that the ERA is so much more extensive than the due-process and equal-protection guarantees of the Texas and United States Constitutions that the amendment constitutionally confers an entitlement to such funds as may be necessary to obtain medical services the State chooses not to provide. In other words, the ERA's scope is such that it trumps section 51–a and compels the legislature either to reject Medicaid matching funds altogether or to appropriate additional funds to provide the services for which there are no matching funds. The Texas Supreme Court has not held the ERA to be so expansive; nor would I.

Based on existing precedent, I would hold that although the ERA requires strict judicial scrutiny to determine that there is a compelling state interest before sex-based discrimination may be sustained and specifically affords protection from government action based on a person's sex, the amendment does not provide an entitlement to funds or create an affirmative *constitutional* obligation to ensure that all persons have the financial resources to obtain medical services. Because the ERA itself does not create an affirmative obligation to fund the medical services left unfunded by the Medical Assistance Program, there is no need to scrutinize that program to determine if there is a compelling state interest to justify the legislature's failure to fund the services.

The Supreme Court has held that the funding restrictions of the Hyde Amendment pass federal constitutional muster. Congress has incorporated these restrictions into the Medicaid assistance program. When Texas elected to participate in such program and enacted the state Medical Assistance Program, the legislature chose to not appropriate additional state funds to provide for medical procedures for which federal reimbursement is unavailable. Although the impact of these events is felt almost exclusively by indigent women, the ERA does not change the calculus of identifying a suspect classification. Poverty is not a suspect classification in Texas. Poverty is a blight on our society, and it is appropriate to seek its eradication. Indeed, it may not be good public policy to deprive indigents of the same medical services available to those able to pay, but that decision the law leaves to the legislature.

Because the ERA does not compel the legislature to fund the medical procedures sought by appellants and the failure to so fund is not predicated on a suspect class, I would hold that the district court was correct in denying the relief sought by appel-

---

**5.** Section 51–a was amended November 2, 1999, after this suit was filed. The changes affected by the amendment are not material to this opinion. The current version of section 51–a is cited for convenience.

**6.** *See* Tex.Hum.Res.Code Ann. § 32.024(e) (West Supp.2000).

lants. Because the majority holds otherwise, I respectfully dissent.[7]

---

7. Because the Court decides this case on the basis of the ERA, the majority does not address appellants' claims that the funding restrictions violate the equal-protection and privacy guarantees of the Texas Constitution. *See supra* at 697 – 698. If the state provisions exceed the protection and guarantees afforded by the United States Constitution, I do not believe that they do so to the extent that they compel the legislature to fund the medical procedures at issue in this case. For the reasons stated above, I would thus overrule appellants' other claims. The majority, although not addressing the equal-protection and privacy issues, observes that the greater number of states that have addressed similar issues have found that their state constitutions compel funding of the medical procedures. *See id.* at 696 n. 8. The tally appears to be seven to four. *See id.* I find this statistic neither conclusive nor persuasive.